**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SUPERIOR ENERGY SERVICES, L.L.C. | * * * | |
| Plaintiffs, | * * | |
| v. | * * | CV-09-321-KD-C |
| BOCONCO, INC. | * * | |
| Defendant. | * | |

**LEGAL MEMORANDUM IN SUPPORT OF DEFENDANT BOCONCO, INC.'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW Boconco, Inc., ("Boconco") and submits the following legal memorandum in support of its Motion to Dismiss Plaintiff Superior Energy Services, LLC's ("Superior") Second Amended Complaint.

**INTRODUCTION AND SUMMARY**

This dispute concerns Superior's claim of title to certain equipment which was purchased by Boconco in connection with the construction of vessels delivered to Superior. That equipment was paid for by Boconco and removed from the vessels, at Superior's request, prior to delivery of the vessels. Superior relies on an alleged oral agreement which was made prior to the delivery of the vessel and prior to the parties' comprehensive Settlement Agreement. Boconco disputes the facts alleged in the Second Amended Complaint regarding the subject 175KW gensets. For purposes of this motion, however, that dispute is immaterial because the parties have settled all disputes relating to these vessel contracts, including any squabble over what equipment should have been included with Hulls 128 and 129. As a result, any claim Superior may have had to title of the gensets prior to the execution of the Settlement Agreement has been terminated and released. Moreover, the

Settlement Agreement itself does not provide any basis for a claim of title to those gensets. As a matter of law, Superior's claims are barred by the terms of the Settlement Agreement.

**NARRATIVE STATEMENT OF FACT**

Boconco Shipbuilding is a locally owned vessel construction business with its sole facility located on Shell Belt Road in Bayou La Batre. Boconco is owned and operated by Wannan "Rusty" Bosarge, Jr. Boconco's principal business is the design and construction of vessels used in oil production and exploration. (See Affidavit of Wannan "Rusty" Bosarge, Jr., ("Bosarge Affidavit"), attached hereto as Exhibit 1). Superior Energy Services is a publically traded global energy company based in New Orleans, with a presence in several foreign countries. The company is described as the nation's 933rd largest corporation. (See Exhibit "D").

In November 2006, Boconco entered into two vessel construction contracts with a company also out of New Orleans called Moreno Energy, Inc. Vessels to be constructed were two 260' "lift boats."[1] The two hulls contemplated under those contracts were designated as Hulls 128 and 129. (A true and accurate copy of the contract for Hull 128 is attached hereto as Exhibit "A").[2] These hulls were the first lift boats constructed by Boconco for this particular customer and, as a result, there were numerous changes to the original specifications. (See Bosarge Affidavit, ¶ 4).

Each lift boat was designed to include three generators: two main generators and one emergency unit. Under Boconco's original specifications, all three generators for each vessel were to be 175kw Caterpillar units. (Id., ¶ 6).

---

[1]A "lift boat" is a vessel used in the offshore oil production exploration industry that is self elevating and self propelled. (See Bosarge Affidavit, ¶ 3).

[2] The contract for Hull 129 is virtually identical. (See Bosarge Affidavit, ¶ 3).

Each contract was structured with "milestone" payments, meaning that the customer was required to pay the overall contract in installments due at various points in the construction of the vessel. The total price for Hulls 128 and 129 was $18,500,000 each.

In the course of constructing Hulls 128 and 129, Boconco purchased the equipment to go on the hulls, including the six C9 gensets. The C9s were purchased from Thompson Tractor ("Thompson"), a local Caterpillar dealer. The purchase was made through a purchase order generated in January 2007. (See Exhibit "B"). Boconco paid in full for the C9 units out of its general account and Thompson delivered those units to Boconco's ship yard. (Bosarge Affidavit, ¶ 12).

In 2008, Superior acquired Moreno's rights under the contract, with Boconco's written consent. (Id., ¶ 5). After Superior became involved in the contracts, Boconco was informed that Superior planned to replace the installed C9 main generators with Cummins 350kw units. At that point in time, all six C9s were installed; three in each of the hulls. (Id., ¶ 8). At Superior's request, Boconco removed the two main generators from each hull. The C9 emergency generator units remained on each hull as originally specified. The unused C9 gensets were stored on Boconco's shipyard until Fall 2008 when they were transported back to Thompson for safekeeping in anticipation of an approaching tropical storm. (Id., ¶19).

In March 2008, Boconco entered into two additional lift boat contracts with Superior for vessels designated as Hulls 130 and 131. (Id., ¶ 13).

Since its involvement in the contracts, Superior had a history of making milestone payments late and failing to fully pay for change orders requested on Hulls 128 and 129. By March 2009, Hulls 128 and 129 were completed and ready to be launched and delivered. However, at that time,

Superior has failed to pay for several outstanding change orders and the parties were in dispute as to what was owed on those hulls.  At that time, however, Boconco was hopeful that the companies could resolve the differences and successfully complete construction of all four vessels.  At the same time, Superior had requested that Boconco deliver Hulls 128 and 129 despite the outstanding disputed issues.  Superior assured Boconco that the outstanding unpaid items would be resolved soon after the delivery of these hulls.  Based on those assurances, Boconco delivered Hulls 128 and 129. At delivery, each of the vessels was equipped with the two 350kw gensets and one C9 emergency unit.  (Bosarge Affidavit, ¶ 16).  Neither hull was delivered with any of the C9 gensets currently in dispute.

After the delivery of Hulls 128 and 129, Boconco's relationship with Superior deteriorated rapidly.  A month after delivery, Superiors executives delivered Boconco a proposed settlement arrangement whereby Superior would take delivery of the two unfinished hulls (Hulls 130 and 131) in exchange for a lump sum payment.  Boconco agreed in principle to the proposal and began what was to be a month long process of ironing out the details.  This process culminated with the parties' entering into a comprehensive Settlement Agreement on August 12, 2009.  Under the Settlement Agreement, Boconco was required to deliver the unfinished hulls, along with the equipment specifically listed on an inventory schedule which became an attachment to the Settlement Agreement.[3]   During the weeks leading up to the final Settlement Agreement, Superior's representatives were allowed full access to Boconco's facility in order to prepare a comprehensive list of all the equipment which Superior proposed to be conveyed along with the unfinished hulls.

---

[3] Superior, with the Courts' permission (See Doc. 21) filed a copy of the confidential Settlement Agreement on October 30, 2009.

Throughout the construction process, Superior was provided an office on Boconco's yard and was allowed full access to the yard so that the on-site representatives could supervise the construction process. This continued throughout the dealings between Boconco and Superior leading up the Settlement Agreement. Throughout the process of compiling the inventory of equipment, Mr. Bosarge made it clear to the Superior representatives that the inventory needed to be comprehensive and that no items not specifically listed on the inventory would be transferred to Superior. This was fully understood by Superior's representatives. (Id., ¶ 21). The agreed upon inventory list became "Schedule 1" of the Settlement Agreement.

At no point did the proposed inventory list include the C9s which were removed from Hulls 128 and 129. In fact, those particular gensets were never even mentioned during this entire process. (Id., ¶ 21). This was a major factor in Boconco's decision to sign the Settlement Agreement. Also during the months leading up to the Settlement Agreement, Superior lowered the amount of the lump sum payment they were prepared to pay. When Boconco ultimately agreed to accept this lower amount, it was aware that the four C9 gensets were not on the inventory list. This represented a value to Boconco of approximately $400,000. Boconco decided to sign the Settlement Agreement with the expectation that it would retain title to the C9 gensets. It would not have agreed to accept the lower lump sum payment had it been required to convey that property to Superior as part of the settlement. (Id. ¶ 22). The inventory list attached to the Settlement Agreement includes the four C18 gensets which were purchased by Boconco for installation in Hulls 130 and 131. Those units had not been installed on those vessels and were, at the time the Settlement Agreement was entered, located at Thompson's facility. Those units were ultimately delivered to Superior pursuant to the Settlement Agreement. The C9 gensets which had been removed from Hulls 128 and 129 were also

located at Thompson but, as stated, were never listed by Superior as equipment it claimed should be transferred. Prior to delivery of the unfinished hulls and the equipment listed on the inventory, Dwayne Boudreaux, Superior's representative, signed the inventory list confirming that everything that was listed had been delivered. A copy of the document signed by Mr. Boudreaux is attached hereto as Exhibit "C".

Several weeks after the Settlement Agreement had been signed, Mr. Bosarge contacted Thompson to arrange for transportation back to Boconco. Thompson initially indicated this would be arranged without any problem. Later, however, Boconco was informed by Thompson representatives that Superior had requested that those same units be delivered to them. Boconco requested that Thompson provide some proof of Superior's title but none was provided. Thompson did provide to Boconco a copy of the Settlement Agreement entered with Superior, which the parties had designated as confidential. No other title document was provided. (Id., ¶ 24).

On October 30, 2009, Superior filed its "Second Amended Complaint" in which it claimed title and a right to possession to certain equipment involved in the vessel contracts. The Complaint addressed two categories of equipment. (1) an assortment of engine parts and engine related equipment, the value of which was estimated as "$30,000" (See Second Amended Complaint, ¶ 2); and (2) the four C9 gensets removed from Hulls 128 and 129. The engine-related equipment was the subject of an Application for Writ of Seizure (Doc. 23) and this Application was resolved by agreement of the parties. The sole remaining dispute between the parties involves title to the C9 gensets.

Superior asserts three causes of action in its Second Amended Complaint: Declaratory Judgment, Conversion and Breach of Contract. All three counts rest on Superior's claim that it

acquired, by agreement, title to the four gensets. Any such claim and, by extension, the causes of action dependent on that claim, are barred by application of the express provisions of the Settlement Agreement.

## ARGUMENT

### A.   Superior's Claim

Superior's claim to ownership of the gensets rests on an alleged side agreement, predating the Settlement Agreement, under which Boconco agreed to convey its title of the gensets to Superior, even though Boconco paid for the gensets, took delivery of them and ultimately removed them from the vessels before the vessels were delivered to Superior.  Superior claims that this agreement was verbal.

This is how Superior describes this alleged side agreement: " [I]t was agreed that the four 175KW gensets returned to Thompson were to be held as the property of Superior, and that two of those 175KW gensets would be installed as spares on Hulls 130 and 131 (which at that time were being constructed by Boconco for Superior) and that Superior would use the remaining two 175KW gensets as spares elsewhere in its operations."  Superior states that this alleged agreement took place prior to the Settlement Agreement.  In fact, as alleged, that agreement would have occurred even prior to delivery of Hulls 128 and 129.  (Doc. 22, ¶ 9.)  Delivery of those hulls took place in March 2009, five months prior to the Settlement Agreement.  Superior also alleges, with no specificity whatsoever, that its title to the 175KW gensets somehow springs from the terms of the Settlement Agreement itself.  However, no provision or section of the Settlement Agreement is referenced. Superior states only that the Settlement Agreement "affected or at least acknowledged the transfer of title of the gensets to Superior."  (Doc. 22, ¶ 8).  However, the main thrust of Superior's claim to

title of the gensets springs from the aforementioned alleged agreement made between Superior and Boconco with respect to Hulls 128 and 129.

Two controlling aspects of the alleged agreement regarding the 175KW gensets emerge from the allegations in the Second Amended Complaint.  First, the alleged agreement concerned (and was part of) the construction contract pertaining to Hulls 128 and 129.  In its complaint, Superior makes it clear that this alleged agreement was made in connection with the construction contracts relative to Hulls 128 and 129.  (Doc. 22, ¶¶ 5, 7 and 9).  Second, the alleged agreement took place prior to the Settlement Agreement (Doc. 22, ¶ 9).  These two aspects are controlling because, as explained below, they place this alleged agreement firmly within those disputes settled between the parties.

**B.      Title Transferred Upon Purchase to Boconco**

It must be noted at the outset that title to the gensets was transferred to Boconco when Thompson delivered the gensets after payment.  Under Alabama law, title to goods shifts to the buyer upon payment and delivery.  Ala. Code Section 7-2-401(2).  *Ledbetter v. Darwin Dobbs Co.*, 473 So.2d 197 (Ala. Civ. App. 1985).

Therefore, the question presented by Superior's Complaint is whether there is some legal basis for its claim that title to that property was somehow transferred, post delivery, to Superior.  As the attached Affidavit makes clear, Boconco is adamant that no agreement, oral or otherwise, existed which would have required it to convey title of the gensets to Superior.  To the contrary, the absence of such conveyance was a main reason why Boconco entered into the Settlement Agreement in the first place.  (See Bosarge Affidavit, ¶¶ 10 and 22).  Boconco signed the agreement with the knowledge expectation that there was no obligation to convey the gensets to Superior and that Boconco would retain title to that property, a significant value for the shipyard, and would not have

done so otherwise.  (Id., ¶ 22).

However, even if this Court assumes there to be a factual dispute as to the existence of an

agreement, Boconco is entitled to a judgment as a matter of law. The application of the plain

language of the Settlement Agreement and the applicable law renders moot any factual issue

regarding the existence of any such agreement.  As explained below, any rights held by Superior

under any pre-existing agreement were merged into and extinguished by the Settlement Agreement.

### C.   Superior is Barred from Enforcing any Pre-Existing Agreement Relating to Construction of Hulls 128 and 129

The legal principles governing settlement agreements were succinctly described by Judge

Brevard Hand as follows:

> In Alabama the substantive law of settlement agreements is well established. "When parties who are sui juris make a final settlement between themselves, such settlement is as binding on them in many respects as a decree of a court. Such an agreement may only be opened for fraud, accident, or mistake." Burks v. Parker, 192 Ala. 250, 68 So. 271, 272 (1915), citing, Scheuer v. Berringer, 102 Ala. 216, 14 So. 640 (1894); Brocato v. Brocato, 332 So.2d 722, 723-24 (Ala.1976); *1033 O'Rear v. Sutton, 215 Ala. 630, 112 So. 159 (1927); Nero v. Chastang, 358 So.2d 740, 741, 743 (Ala.Civ.App.1978). No matter how unjust one party may later come to regard the settlement, if it is free from fraud, it cannot be attacked. Likewise, if subsequent developments do not meet the expectations of the settling party, the settlement is not open to collateral attack. Western Grain Company Cases, 264 Ala. 145, 85 So.2d 395, 414 (1955).

*Oaks v. City of Fairhope, Alabama*, 515 F.Supp. 1004, 1031 (S.D. Ala., 1981).[4]

A settlement agreement is a conclusive resolution of all elements of the dispute between the

parties except those specifically reserved in the agreement. *Gonzalez, LLC v. DiVincenti*, 844 So.2d

1196, 1202 (Ala. 2002); *Sho-Me Motor Lodges, Inc. V. Jehle-Slauson Const. Co.*, 466 So.2d 83, 91

---

[4]The parties have agreed that the Settlement Agreement is to be construed and enforced in accordance with Alabama law.  (See Settlement Agreement, ¶ 14).

(Ala. 1985); *Long v. City of Hoover*, 844 So.2d 1273 (Ala. Civ. App. 2002); *Cain v. Saunders*, 813 So.2d 891, 894 (Ala.Civ.App. 2001); *Nero v. Chastang*, 358 So.2d 740 (Ala.Civ.App.1978). "[O]ne who agrees to settle his claim cannot subsequently seek both the benefit of the settlement and the opportunity to continue to press the claim he agreed to settle." *Kirby v. Dole*, 736 F. 2d 661, 664 (11th Cir. 1984); see also *Perrman v. West*, 949 F. Supp 815, 822 (M.D. Ala. 1996).

A settlement agreement is as binding on the parties as any other contract and the established rules of construction apply. *Coaker v. Washington County Bd. of Educ.*, 646 So.2d 38 (Ala.Civ.App.1993). "[A] release supported by a valuable consideration, unambiguous in meaning, will be given effect according to the intention of the parties from what appears within the four corners of the instrument itself, and parol evidence may not be introduced to establish the existence of a mutual mistake of fact when the release was signed as a basis for a rescission of that release." *Cleghorn v. Scribner*, 597 So.2d 693, 696 (Ala.1992); see also, *State Farm Mut. Auto. Ins. Co. v. Brackett*, 527 So.2d 1249 (Ala.1988). See also *Marriott Int'l, Inc. v. deCelle*, 722 So.2d 760 (Ala.1998); *Clark v. Albertville Nursing Home, Inc.*, 545 So.2d 9 (Ala.1989).

From the express language of the four corners of the Settlement Agreement, it is clear that the parties intended a full and comprehensive resolution of all disputes relating to the four vessel contracts. Throughout the document the parties consistently describe the scope of their agreement in broad and comprehensive terms. The express intent is to encompass matters beyond those specifically contemplated within the vessel contracts and to include all those matters relating to the vessels. An example of the parties' intent is Paragraph "D," part of the preamble of the agreement:

> There exists several disputed matters as between the Parties under the Contracts in connection with the construction of the Vessels and the Parties desire to **fully and finally settle all disputes, together with all other claims arising under, related to**

> **or in connection with the Contracts and the transactions contemplated
> thereunder**.

(Settlement Agreement, ¶ D)(emphasis added).

In Paragraph 1, which sets out the basic settlement terms, the agreement is described as a

"full and final settlement and compromise of all claims arising under, related to or in connection with

the Contracts and the transactions contemplated thereby... ." (Settlement Agreement, ¶ 1).  The term

"Contracts" is specifically defined in the agreement to include the four vessel contracts, "together

with all change orders, amendments, supplements, waivers and other modifications thereto... ."

(Settlement Agreement, ¶ A).

The agreement employs the broadest terms possible when describing its scope and this

language leaves no room for Superior's *post hoc* attempt to enforcement any pre-existing alleged

side agreement.  There is no indication that the parties reserved any right to enforce any pre-existing

agreement regarding equipment relating to the hulls.   If such an agreement existed, it was clearly

related to the construction of Hulls 128 and 129 and was encompassed in the parties' agreement.

Beyond the broad general language referenced above, the Settlement Agreement goes further

to specifically terminate all rights and obligations which then existed relating to all four vessel

contracts.  Paragraph 2 of the Settlement Agreement states as follows:

> **Termination of Contracts.** Each Contract (which the Parties expressly acknowledge
> does not include this Agreement) and *each Party's respective rights, remedies and
> obligations under each Contract is hereby terminated*, and is of no further force or
> effect, except that the warranties of Builder relating to conveyance of title to the
> Vessels to Ship-owner free and clear of any liens, pledges or other encumbrances of
> any kind shall remain in full force and effect.

Settlement Agreement, ¶ 2 (emphasis added).   This point is made again in Paragraph 5(b): "Each

Party agrees that each of its respective rights, remedies and obligations under the Contracts are

hereby terminated." (Id., ¶ 5(b)).

The Agreement further provides that "[n]o Party shall take any further action in [this lawsuit] except as may be necessary to enforce a Party's rights hereunder... ." Settlement Agreement, ¶ 5(a). Superior's Second Amended Complaint seeks to enforce an alleged side agreement not encompassed within the Settlement Agreement. The assertion of such a claim is expressly prohibited by Paragraph 5(a).

The Settlement Agreement also contains a broad and sweeping merger clause:

> **Entire Agreement.** This Agreement, its exhibits, schedules and appendices, represent the entire agreement as among the Parties with respect to the subject matter hereof and thereof, and **supersedes any and all previous correspondence, discussions, negotiations, arrangements or agreements, whether oral or written, by the Parties or any other person.**

Settlement Agreement, ¶ 17 (emphasis added).

The Alabama Supreme Court has described the effect and purpose of a merger clause as follows:

> A merger clause, also known as an integration clause, 'is a portion of a particular contract that restates the rationale of the parol evidence rule within the terms of the contract.' Environmental Sys., Inc. v. Rexham Corp., 624 So.2d 1379, 1383 (Ala.1993). These clauses 'are properly used to ensure that preliminary negotiations, whether oral or written[,] are either memorialized in the final contract or are not considered part of it.' Crown Pontiac, Inc. v. McCarrell, 695 So.2d 615, 618 (Ala.1997). Moreover, a merger clause 'establish[es] that a written agreement is a completely integrated document, into which all prior and contemporaneous negotiations are merged.' Crimson Indus., Inc. v. Kirkland, 736 So.2d 597, 601 (Ala.1999).

*Harbor Village Home Center, Inc. v. Thomas*, 882 So.2d 811, 816 (Ala.2003).

Significantly, the merger clause in the Settlement Agreement extends beyond the negotiations leading up to the agreement to encompass "all previous correspondence, discussions, negotiations,

arrangements or agreements, whether oral or written, by the Parties or any other person." (Settlement

Agreement, ¶ 17).  Any prior agreement to convey title to the C9s was clearly encompassed within

this clause.

The Settlement Agreement also provides full and comprehensive releases by each party of

all claims against the other relating to the contracts.  Superior specifically released all claims "arising

out of or in connection with, resulting from, attributable to or in any way incidental to the Contracts,

the performance thereof and the transactions contemplated thereunder."  Id., ¶ 3(c).  Here is the full

release:

> Superior hereby expressly waives, releases, remises and forever discharges Builder,
> as well as its affiliated, related and subsidiary companies, and their respective
> owners, officers, agents, directors, managers, employees, servants, successors,
> assigns, sureties, insurers, underwriters and indemnitees, of and from any and all
> Losses caused by, arising out of or in connection with, resulting from, attributable to
> or in any way incidental to the Contracts, the performance thereof and the
> transactions contemplated thereunder, including the construction of the Vessels;
> provided, however, that the foregoing does not waive, release, remise or discharge
> Builder from its warranties relating to the conveyance of title to the Vessels to Ship-
> owner free and clear of any liens, pledges or other encumbrances of any kind.

Id. ¶ 3(c)

The sole exception to the release is "warranties relating to the conveyance of title to the

Vessels."   Examination of this language in the context of the agreement as a whole demonstrates

that the C9s in dispute cannot be included in this carve out.   The term "Vessels" is defined in the

agreement to include both the "Partially Completed Vessels" (Hulls 130 and 131) and the "Delivered

Vessels."  The C9s were not part of or related to the "Partially Completed Vessels," nor where they

included in the "equipment" listed on "Schedule 1" (See Paragraph 1(d)).  The term "Delivered

Vessels" refers to Hulls 128 and 129.  That term more specifically describes the vessels as they were

"delivered."  Paragraph "B" states the "[s]hip-owner has taken delivery of hull numbers 128 and 129

(the "Delivered Vessels").  It is undisputed that the "delivery of hull numbers 128 and 129" did not

include the delivery of the C9s, which were removed from the months before delivery.  Therefore,

neither "Delivered Vessels" nor "Vessel" can be construed to include the C9 units addressed in

Superior's complaint.

> **C.     Boconco's Obligations under the Settlement Agreement Do Not Include the C9 Units**

Nothing in the Settlement Agreement gives title to the 175KW gensets to Superior.  The

Settlement Agreement does impose a duty upon Boconco to transfer title to Superior with respect

to certain equipment.  However, that duty is very specifically and narrowly described in the

Settlement Agreement.  That obligation is described in Paragraph 1(d), which states as follows:

> Pursuant to a bill of sale in the form attached hereto as Exhibit "A"(the "Bill of Sale"), Builder shall convey to Ship-owner title to the Partially Completed Vessels and all equipment and materials present in the Shipyard and related to the Partially Completed Vessels (the "Equipment"), including the Equipment described on **Schedule 1** attached hereto, free and clear of all security interests, liens, claims, charges, options, mortgages, debts, leases (or subleases), conditional sales agreements, title retention agreements, encumbrances of any kind, or restrictions against the transfer or assignment thereof (collectively, "Liens"), other than Liens securing payment of the Assumed Obligations (as defined in Section l(f) below). Ship-owner acknowledges that. Builder shall not be obligated to deliver to it those items listed on **Schedule 1** under the heading "Added" and identified as being located at a location other than the Shipyard, provided that if any such Equipment is delivered to the Shipyard or tendered to Builder after the Settlement Effective Date, Builder shall promptly notify Ship-owner and shall cooperate with Ship-owner in its efforts to take possession of such Equipment.

Id., ¶ 1(d).

Pursuant to this provision, and in conjunction with signing the Settlement Agreement,

Boconco executed a Bill of Sale transferring title to those items listed on Schedule 1.  Schedule 1

was compiled with Superior's input after weeks of deliberation between Superior and Boconco. (See Bosarge Affidavit, ¶¶ 20-21).   Most importantly, Boconco's obligation under the Settlement Agreement to convey title *only* extends to unfinished Hulls 130 and 131, as well as equipment related to those hulls.[5]  The Settlement Agreement does not impose any obligation upon Boconco to convey title to any equipment relating to Hulls 128 or 129.

It is well established that where parties to a contract include a specific description or list of items, any accompanying general language does not expand or restrict the specific description unless such intent is manifest.  *Ex Parte Dan Tucker Auto Sales, Inc*. 718 So.2d 33 (Ala 1998); ERA *Commander Realty, Inc. v. Harrigan*, 514 So.2d 1329 (Ala 1987). In the case at bar, the parties specifically listed those items to be conveyed to Superior.  Superior pleads, without citing a specific section of the Agreement, that the Settlement Agreement "affected or at least acknowledged the transfer of title of the gensets to Superior." (Doc. 22, ¶ 8).  However, the list enumerated by the parties would operate to trump any implied meaning from the more general language in the agreement.   (Id.). Title to the gensets could not be conveyed by implication when Superior voluntarily agreed to an enumerated list of items to be conveyed.

Superior knew about the C9 gensets prior to entering into the Settlement Agreement.  It could have, but did not, insist that title to that property be expressly provided for in the Settlement Agreement.  It could have, but did not, bargain for those gensets during the months of negotiations that led to that agreement.  At the same time, of course, Superior is enjoying the benefits of its bargain with Boconco.  It obtained title to Hulls 130 and 131 and the equipment listed in Schedule

---

[5]Schedule 1 does list "4 gensets."   These refer to the four 350 KW units that were ordered in connection with Hulls 130 and 131.  Paragraph 1 does not require any title conveyance of equipment delivered in connection with Hulls 128 and 129.

1; and it obtained releases by Boconco meaning that it owes Boconco no additional money under the vessel contracts. Superior now seeks, through this litigation, to expand those benefits to include title to the C9. Allowing Superior to do so would effectively re-write the parties' agreement and nullify the conclusive effect of the Settlement Agreement. Because this maneuver runs afoul of the express language of the agreement and parties' intent to resolve all collateral arrangements, it should be rejected.

## CONCLUSION

For all the reasons set forth above, Boconco is entitled to a judgment in its favor as a matter of law and its motion for summary judgment is due to be granted.

s/Kenneth J. Riemer
KENNETH J. RIEMER (RIEMK8712)
Underwood & Riemer, P.C.
Attorney for Defendant
P.O. Box 1206
Mobile AL 36633
Telephone: (251) 432-9212
Facsimile: (251) 433-7172
Email: kjr@alaconsumerlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 8th day of September, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification to all counsel of record.

s/ Kenneth J. Riemer
KENNETH J. RIEMER
