IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SUPERIOR ENERGY SERVICES, L.L.C., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NO. 09-321-KD-C |
| | * | |
| BOCONCO, INC., | * | |
| | * | |
| Defendant. | * | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, Superior Energy Services, L.L.C. ("Superior"), and files this brief in opposition to the motion for summary judgment filed by Defendant, Boconco, Inc. ("Boconco"). As shown in the affidavit of Dwayne Boudreaux filed in support of this opposition and the legal arguments set forth below, there is a genuine issue of material fact for trial in this action and Boconco is not entitled to judgment as a matter of law. Accordingly, Boconco's motion is due to be denied.

### Introduction

Essentially, there are two components to Boconco's motion. First, through the affidavit of Mr. Wannan "Rusty" Bosarge, Boconco denies the existence of the agreement made the basis of Superior's claim of ownership of the four Caterpillar C9 175 kw generators (hereinafter the "175s") at issue in this action. Second, Boconco reasserts the argument previously made in support of its motion to dismiss, which the Court has already rejected, that the Settlement Agreement between Superior, Moreno Energy, Inc. ("Moreno"), and Boconco, dated August 12, 2009, bars Superior's claim of

{MB012002.1}

claim of ownership of the four 175s. As to the former, Superior files herewith the affidavit of Dwayne Boudreaux, who was Superior's director of operations dealing directly with Boconco in connection with the construction of the hulls and the agreement made concerning ownership of the four 175s. Mr. Boudreaux's affidavit provides substantial evidence that in August 2008 he had discussions with Boconco's representative, Kenny Bosarge, in which it was agreed that upon their removal from Hulls 128 and 129 the four 175s would be the property of Superior. Additionally, provided with Mr. Boudreaux's affidavit are several documents showing communications and a course of dealing between the parties consistent with the agreement that Superior was the owner of the four 175s.

As to the latter, Boconco's argument that the Settlement Agreement bars Superior's claim of ownership of the gensets must be rejected for the same reason the Court rejected that argument in Boconco's motion to dismiss. At the motion to dismiss stage the Magistrate Judge observed that Superior "alleges that prior to the settlement agreement" the parties reached an agreement that the four 175s were the property of Superior and concluded that "it is far from clear that the Complaint or its attachments establish that the claims now being asserted are barred by the terms of the aforementioned settlement agreement. . . . If the facts alleged in the Complaint are shown to be true, it cannot be said that Superior could not be granted relief in the form of a judgment that it is the owner of those gensets described or that it could not be granted damages for either conversion or breach of contract." Report and Recommendation (Doc. 56) at 6, 14-15.[1] At the summary judgment stage, the issue is

---

[1] The District Court subsequently entered an order and judgment adopting the Magistrate Judge's recommendation, without objection from Boconco. (Docs. 58 and 59)

whether Superior has presented substantial evidence that prior to entering into the Settlement Agreement Superior and Boconco had already agreed that the four 175s were the property of Superior. As discussed above, and as shown in the affidavit of Mr. Boudreaux and the exhibits thereto, Superior has presented such substantial evidence.

While in its brief Boconco may discuss the provisions of the Settlement Agreement in more detail than it did in its earlier brief, and cites a number of cases for general propositions of law, Boconco has not and cannot cite any provision of the Settlement Agreement nor any case law supporting the proposition it urges – that the Settlement Agreement reached in August, 2009, somehow rescinds or undoes ab initio the agreement reached between the parties in August, 2008, that upon their removal from Hulls 128 and 129 the four 175s were the property of Superior.

**When the Four 175s were Removed from Hulls 128 and 129 Superior and Boconco Agreed they were the Property of Superior.**

The affidavit of Dwayne Boudreaux, who was Superior's director of operations dealing directly with Boconco, provides evidence of the circumstances leading up to the removal of the four 175s from Hulls 128 and 129, the agreement made between Superior and Boconco that those four 175s were then the property of Superior, and communications and a course of dealing thereafter consistent with such agreement having been made. More specifically, in April, 2008, Superior entered into an Assignment and Assumption Agreement with Moreno under which Superior initially acquired a 50% interest in the contracts for the construction of Hulls 128 and 129, and ultimately acquired the rights of Moreno entirely as to Hulls 128, 129, 130 and 131. Boudreaux affidavit at para. 2. In connection with acquiring an interest in the hulls, Superior inspected the hulls then under construction. At that time Boconco had already

installed six 175s on Hulls 128 and 129, two on each hull as main generators and one on each hull as emergency generators. Id. at para. 4. In June, 2008, Superior conducted load analyses and determined that 175s were not sufficient to power the vessels as main generators. Thus, Superior required that the four 175s be removed and replaced with four larger 300 kw gensets. Id. at para. 5.

Boconco, through Kenny Bosarge, initially objected to the replacement of the 175s expressing the view that those gensets had been specified and agreed to in the contracts, and thus Boconco should have no burden for the upgrade. At that time Mr. Boudreaux advised Mr. Bosarge that he understood that position and would report the same to his superiors within Superior. Mr. Boudreaux and Mr. Bosarge had a later discussion about whether Superior would receive an offset against the purchase price of the hulls, in which case the 175s would belong to Boconco, or would not receive an offset, in which case the 175s would belong to Superior. No agreement was made during that discussion. Subsequently, in early August, 2008, the 300 kw gensets arrived on the yard and Boconco removed the four 175s from Hulls 128 and 129. At that time Mr. Boudreaux had discussions with Kenny Bosarge on Boconco's yard in which it was agreed that Superior would provide the four 300 kw gensets replacing the four 175s being removed from Hulls 128 and 129, that Superior would pay Boconco for removing the 175s and other work necessary to install the 300 kw gensets on the hulls, that there would be no offset against the purchase price of Hulls 128 and 129 for the four 175s even though they would not be used in the construction of those hulls, and as a result the four 175s removed from Hulls 128 and 129 would be the property of Superior. Id. at para. 6.

{MB012002.1}                                    4

There also were discussions with Boconco, which included a representative of Thompson Tractor ("Thompson"), Chuck Castro, about the uses or other disposition Superior might make of the 175s. Superior was concerned about the manufacturer's warranty beginning to run and thus it was agreed that the 175s would be returned to Thompson's warehouse. It also was discussed that Superior would later provide two of the 175s to be used as emergency generators on Hulls 130 and 131. As to the other two 175s, the potential for those gensets to be sold to another party for Superior's credit or possibly converting those 175s to stand-alone, portable generators Superior could use elsewhere was discussed. Mr. Bosarge participated in these discussions with Superior and Thompson concerning the disposition of the four 175s. Mr. Bosarge did not express any opposition to Superior's control over the disposition of the 175s. Id. at para. 7.

Attached as Exhibit A to Mr. Boudreaux's affidavit are handwritten notes produced by Thompson which Mr. Boudreaux believes are notes made by Mr. Castro during these discussions. The C9s referred to in Mr. Castro's notes are the 175s at issue. As the Court can see, these notes are consistent with the agreement made between Superior and Boconco and the potential dispositions being considered by Superior. Specifically, these notes reflect that two of the 175s were being returned for warehousing and "sell [sic] to interested party." The notes further reflect that two of the

C9s were returned "for keeping until Hull 130 & 131 are required."[2]

Of more significance, however, are documents generated by Boconco itself in December, 2008 which are consistent with the agreement reached in August. Attached as Exhibit B to Mr. Boudreaux's affidavit are change order 17 for Hull 128 and change order 17 for Hull 129 which increased the purchase price of each of those hulls $110,000 for the upgrade of the main electrical panels to support the 300 kw generators. Included in Exhibit B is change order 18 for Hull 128 and change order 18 for Hull 129, entitled "Removal and Replacement of Generators Change," adding $31,680 to the price of each hull for work relating to the removal of the 175s and the installation of the 300 kw gensets. These change orders expressly note that "Customer supplied the 300 K.W. Generators." (emphasis added). As the Court can see, all of these change orders were signed by Rusty Bosarge on behalf of Boconco, Mr. Boudreaux on behalf of Superior (customer) and Michael Debaillon for Moreno. Consistent with the agreement that upon their removal from Hulls 128 and 129 the four 175s were the property of Superior, neither these change orders nor any other change order gave Superior an offset against the purchase price of those hulls for the 175s not used in the construction of the hulls. Boudreaux affidavit at para. 9 and Exhibit B thereto.

In support of its motion, Boconco submits the affidavit of Rusty Bosarge who contends that Superior did not pay for the four 175s, and cites as evidence thereof two

---

[2] Superior respectfully submits that the affidavit of Mr. Boudreaux, even without considering the handwritten notes produced by Thompson, constitutes substantial evidence of the agreement with Boconco that the four 175s were the property of Superior. The notes produced by Thompson are more in the nature of corroborating evidence. However, in the event the Court is of a different view, Superior requests the opportunity to conduct additional discovery, and in particular the depositions of Mr. Castro and/or other representatives of Thompson, as offered by the Magistrate Judge in the hearing on the parties' joint motion to extend discovery.

invoices issued by Boconco.   Affidavit of Rusty Bosarge at paras. 12 and 15.[3] Boconco's reliance on these supposed invoices is misplaced for multiple reasons.  First, as shown in the affidavit of Mr. Boudreaux, the agreement was that by Superior providing the 300 kw generators, paying Boconco for work required to remove the 175s and install the 300s, and not receiving an offset for the four 175s which were not being used to construct Hulls 128 and 129, those four 175s would be the property of Superior. The invoices referred to by Boconco in no way negate that agreement.  Indeed, at least as to Hull 128, the invoice relied upon by Boconco conclusively and mathematically negates the possibility that the sum invoiced by Boconco included an amount owed for the 175s. As the Court can see, Boconco's own "invoice" for Hull 128 shows the cost of vessel at completion to be $22,263,674.32 and that Superior had paid $22,497,800.81, i.e., $233,334.49 more than the costs of completion of the vessel.   In other words, according to Boconco's own "final billing" for Hull 128, Superior paid all of the costs of that vessel and part of Boconco's claimed profit (although the construction contracts contained no provision for 10% profit).

Moreover, the supposed "invoices" relied upon by Boconco must be put in their proper context. As the Court can see from Exhibit F to Mr. Boudreaux's affidavit, these invoices are dated June 9, 2009 and thus were issued after Superior terminated the contracts for Hulls 130 and 131 and after Superior had already sued Boconco in this case.  These invoices were immediately rejected by Superior as inconsistent with the contracts and inaccurate.   Boudreaux affidavit at para. 11 and Exhibit G thereto.

---

[3] The Court likely has already observed that Boconco did not provide the invoices to the Court in support of its motion.  Superior provides these invoices to the Court as Exhibit F to the affidavit of Mr. Boudreaux.

Additionally, these invoices were given specific treatment in the Settlement Agreement between Superior and Boconco and the same were rescinded. See Settlement Agreement previously filed under seal, para. 5(b).[4]

Finally, communications between and conduct of the parties when consummating the Settlement Agreement also were consistent with the earlier agreement made concerning the four 175s. When inventorying materials and equipment on Boconco's yard to be delivered to Superior, Mr. Boudreaux found the cooling towers (radiators) for the four 175s Superior had in storage with Thompson. Mr. Boudreaux discussed the cooling towers with Kenny Bosarge and reminded him they were the cooling towers for Superior's 175s. Mr. Bosarge agreed and thus the cooling towers were included on schedule 1 of the Settlement Agreement and Superior took possession thereof. At that time Mr. Bosarge made no assertion that the 175s belonged to Boconco and thus Boconco should retain the cooling towers. It is illogical that Boconco would acknowledge Superior's ownership of the cooling towers for the 175s and allow Superior to take possession thereof, and yet assert that the 175s were property of Boconco. Despite these circumstances plainly calling on it to do so, Boconco made no assertion of ownership of the 175s until after the Settlement Agreement was consummated. See Boudreaux affidavit at para. 12.

---

[4] Attached as Exhibits C and D to the affidavit of Mr. Boudreaux are the contracts for the construction of Hulls 128 and 129, respectively. Attached as Exhibit E is an Estoppel and Consent Certificate executed by Boconco when Superior acquired an interest in the hulls. In the Estoppel and Consent Certificate Boconco acknowledged that it had received all payments through the fifth progress payment as provided for in the contract, which included the installation of the 175s as the same had already been installed when Superior acquired an interest in the hulls. See Boudreaux affidavit at para. 10 and Exhibits C, D, and E thereto. Again, while change orders were subsequently executed adding to the price of these hulls for materials and work required to remove the 175s and install the 300s, and noting that the 300s were being provided by Superior, neither these change orders nor any other document reflect that Superior was at any time given an offset against the price for the four 175s not used in the construction of Hulls 128 and 129. In fact, even in his affidavit Mr. Bosarge does not assert that Superior received a credit or offset against the price of Hulls 128 and 129 for the four 175s not used in the construction.

In sum, the affidavit testimony of Mr. Boudreaux constitutes substantial evidence that at the time the four 175s were removed from Hulls 128 and 129 Boconco and Superior agreed that they were the property of Superior. Mr. Boudreaux's affidavit testimony is further supported by documents evidencing communications and a course of dealing between the parties consistent with the agreement the four 175s were the property of Superior. In contrast, Boconco relies on the conclusory affidavit of Mr. Rusty Bosarge that there was no such agreement which supposedly is supported by the invoices referred to in Mr. Bosarge in his affidavit, but which Boconco omitted to provide the Court. Neither these invoices, any other document referred to by Boconco, or even the affidavit of Mr. Bosarge, negates the specific evidence presented by Superior that the parties agreed that by Superior providing the 300 kw generators and not receiving an offset against the purchase price of the hulls for the four 175s not being used in the construction, the four 175s were the property of Superior. In fact, at least as to Hull 128, the invoice relied upon by Boconco negates to a mathematical certainty Boconco's position. In any event, given the substantial evidence presented by Superior supporting its claim of ownership, Boconco's motion must be denied.

## The Settlement Agreement Does Not Divest Superior of its Ownership of the Four 175s

Boconco's argument that the Settlement Agreement bars Superior's claim of ownership of the four 175s is the same argument made in support of its motion to dismiss. The Court has already rejected that argument. Of course, the terms of the Settlement Agreement have not changed since the earlier ruling of this Court.

{MB012002.1}                                          9

While admittedly the terms of the Settlement Agreement are broad, ownership of the four 175s is not a subject of the Settlement Agreement. The agreement between Superior and Boconco that the four 175s were the property of Superior was effected in August 2008 when the 175s were removed from Hulls 128 and 129, which was months before Hulls 128 and 129 were delivered and roughly a year before the parties entered into the Settlement Agreement. As explained in Mr. Boudreaux's affidavit, there was no need to address ownership of the 175s in the Settlement Agreement because the parties had already agreed that Superior owned the 175s. Contrary to Boconco's assertion, Superior's position is not that Boconco has some unperformed duty to convey title to the four 175s; rather, Superior's position and evidence is that long before Hulls 128 and 129 were delivered and a year before the parties settled claims under the executory vessel construction contracts, the parties had already agreed the four 175s belonged to Superior. Under these circumstances, the termination, merger, and release provisions of the Settlement Agreement relied upon by Boconco simply do not bar Superior's claim of ownership.

More specifically, Boconco's reliance on paragraph 2 of the Settlement Agreement, providing for the termination of the vessel construction contracts, is misplaced because the termination clause does not state that it divests Superior of ownership and because the termination of the contracts does not in law rescind the earlier agreement under which Superior's ownership of the four 175s which had already accrued. In other words, "a mere termination of a contract is not a rescission. 'The exercise of an option to terminate prevents liability for further transactions but does not affect obligations which have already accrued.'" United States v. Southern Gulf Lumber

Co., 106 F.Supp. 815, 818 (S.D. Ala. 1952). See also National Supply Co. v. Southern Creamery Co., 224 Ala. 507, 140 So. 590, 592 (Ala. 1932) ("To rescind a contract is not merely to terminate it, but to abrogate it and undo it from the beginning; that is, not merely to release the parties from further obligation to each other in respect to the subject contract, but to annul the contract and restore the parties relative to positions which they would have occupied if no such contract had ever been made."). Boconco has not and cannot cite any provision of the Settlement Agreement purporting to rescind Superior's ownership of the four 175s which accrued under the earlier agreement.[5]

Likewise, Boconco's reliance on the merger clause is misplaced for multiple reasons. First, by its own terms the merger clause applies only "with respect to the subject matter [of the Settlement Agreement]". Settlement Agreement para. 17. As Boconco itself concedes, ownership of the four 175s at issue is not a subject of the Settlement Agreement. Boconco's Brief at 1-2, 14. Of course, under Alabama law, for an earlier agreement to be superseded or merged into a later agreement the two agreements must cover the same subject. See Cavalier Mfg, Inc. v. Clarke, 862 So. 2d 634, 640 (Ala. 2003); Belmont Homes, Inc.v . Law, 851 So. 2d 237, 241 (Ala. 2002). Indeed, as the "party claiming that [the Settlement Agreement] modifies a prior contract [Boconco] must show that the later contract is definite and certain as to the terms of modification, and the modification extends only so far as the terms are definite, certain and intentional." Johnson-Rast & Hayes, Inc. v. Cole, 294 Ala. 32, 37 (1975) (emphasis added). Again, since Boconco concedes that ownership of the 175s is not even

---

[5] Indeed, in paragraph 5 (b) of the Settlement Agreement, the parties indicated their understanding of the difference between terminating executory contract rights and a rescission. As shown in paragraph 5(b) of the Settlement Agreement, the rights of the parties in the vessel construction Contracts were terminated, however, the invoices relied upon by Boconco in support of its motion were rescinded.

addressed in the Settlement Agreement, it cannot show any definite or certain terms modifying the parties' earlier agreement that Superior owned the 175s, much less divest Superior of ownership which had already accrued.

Additionally, a merger clause, by its very nature, only applies to executory contracts. See Umani v. Reber, 155 A. 2d 634, 637 (Pa. Super. 1959) (oral escrow agreement which had been fully performed could not be merged into subsequent written agreement); McCall v. Texas Dragline Service Co., 188 S.W. 2d 243, 246 (Tex. Civ. App. 1945) (verbal agreement partially performed by parties at the time of execution of a written agreement was no longer executory and therefore not merged into written agreement); Simpson Advertising Service Co. v. Manufacturers & Merchants Association of St. Louis, 51 S.W. 2d 1019, 1024 (Mo. 1932) ("The doctrine of merger of prior negotiations applies only to executory contracts."); 17A CJS Contracts § 417 ("An oral agreement is merged in a subsequent written one only where the oral agreement is executory on both sides."). See also E.T. Gray & Sons v. Satuloff Bros., 213 Ala. 526, 105 So. 666, 668 (Ala. 1925) (where a contract is executory the parties may abandon, rescind or modify by subsequent agreement); Peoples Bank & Trust v. Coleman, 736 F. 2d 643, 645 (11th Cir. 1984) ("[I]t is clear that in Alabama, as is doubtless true in every state, the parties to a contract may modify an executory contract as they see fit."). Again, the agreement between Superior and Boconco concerning the four 175s having already been effected, the merger clause in the Settlement Agreement cannot apply thereto.

Even assuming arguendo ownership of the 175s was a subject of the Settlement Agreement, and further assuming the merger clause could be applied to the earlier

executed contract under which Superior took ownership of the 175s, a merger clause only vitiates terms of the earlier contract which are inconsistent with the more recent contract.    Cavalier Mfg, 862 So. 2d at 641 ("When parties execute successive agreements and the 'two agreements cover the same subject matter and include inconsistent terms the later agreement supersedes the earlier agreement.'" (emphasis added)).  See also Atlanta Integrity Mortgage, Inc. v. Ben Hill United Methodist Church, Inc., 650 S.E. 2d 359, 362 (Ga. App. 2007) ("In order for the merger rule to apply, however, the parties to the merging contract must be the same and the terms of those contracts must completely cover the same subject matter and be inconsistent."); Hagerbaumer v. Hagerbaumer Bros., Inc., 305 N.W. 2d 4, 6-7 (Neb. 1981) ("A subsequent contract which does not completely cover the same subject matter of a prior agreement and does not contain terms inconsistent with the former contract so that the two cannot stand together does not supersede or substitute for the earlier contract . . . ."). Of course, there is no provision of the Settlement Agreement inconsistent with Superior's ownership of the four 175s under the earlier agreement, such that the two agreements cannot stand together.

Lastly, the release language of the Settlement Agreement does not bar Superior's claim of ownership premised on the earlier agreement effected more than a year before the Settlement Agreement was executed. Under Alabama law, a settlement agreement "is conclusive only as to those matters the parties have fairly intended to include within its terms [and] does not ordinarily include claims not known at the time of, or arising after, the settlement." Nero v. Chastang, 358 So. 2d 740, 743 (Ala. Civ. App. 1978). See also 15A CJS Compromise & Settlement § 41 ("Demands of which a party

had no knowledge cannot ordinarily be regarded as included [within the settlement].") & § 42 ("Causes of action or claims arising subsequent to the settlement are not settled or barred. . . ."). In the instant case, neither the release provisions, nor any other provision of the Settlement Agreement expressed an intent to settle or release claims or disputes not then known to the parties. And, as shown by the affidavit of Mr. Boudreaux, as well as the affidavit of Mr. Bosarge, it was not until after the parties consummated the Settlement Agreement that Superior had any indication that Boconco was claiming ownership of the four 175s. This lack of indication by Superior was furthered by Boconco's agreement that the cooling towers for the four 175s were the property of Superior. Under these circumstances the release provision does not bar Superior's claim to ownership of the four 175s.

## Conclusion

In accordance with the foregoing, Superior respectfully submits that Boconco's motion for summary judgment must be denied. Superior has submitted to the Court substantial evidence that at the time the four 175s were removed from Hulls 128 and 129, Superior and Boconco agreed that those gensets were the property of Superior. Superior's ownership of the four 175s vested at that time. The Settlement Agreement does not bar Superior's claim based on its ownership of the four 175s. Ownership of the 175s is not even a subject matter of the Settlement Agreement and there is no provision of the Settlement Agreement purporting to rescind or divest Superior's ownership thereof.

Respectfully submitted,

s/Kenneth A. Watson
KENNETH A. WATSON (WATSK3123)
Attorney for Superior Energy Services, LLC

OF COUNSEL:

Jones, Walker, Waechter, Poitevent, Carrère
      & Denègre L.L.P.
Post Office Box 46
Mobile, Alabama 36601
kwatson@joneswalker.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2010, I served a copy of the foregoing pleading on all counsel of record by placing same in the United States Mail, postage prepaid and properly addressed, to-wit:

Kenneth J. Riemer, Esq.
166 Government St., Suite 100
Mobile, Alabama 36602
kjr@alaconsumerlaw.com

s/Kenneth A. Watson
KENNETH A. WATSON