IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SUPERIOR ENERGY SERVICES, L.L.C.,　　*
　　　　　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　　　*
　　　　　　　Plaintiff,　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　　　　　　*　　CIVIL ACTION NO. 09-321-KD-C
　　　　　　　　　　　　　　　　　　　　　*
BOCONCO, INC.,　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　　　*
　　　　　　　Defendant.　　　　　　　　*

## NOTICE OF FILING

COMES NOW Plaintiff, Superior Energy Services, L.L.C. and gives notice of the filing of the following materials, attached hereto, in support of its Brief in Opposition to Defendant's Motion for Summary Judgment: the Affidavit of Dwayne Boudreaux and Exhibits A-G thereto.

Respectfully submitted,

s/Kenneth A. Watson
KENNETH A. WATSON (WATSK3123)
Attorney for Superior Energy Services, LLC

OF COUNSEL:

Jones, Walker, Waechter, Poitevent, Carrère
　　& Denègre L.L.P.
Post Office Box 46
Mobile, Alabama 36601
kwatson@joneswalker.com

{MB012138.1}

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2010, I served a copy of the foregoing pleading on all counsel of record by placing same in the United States Mail, postage prepaid and properly addressed, to-wit:

Kenneth J. Riemer, Esq.
166 Government St., Suite 100
Mobile, Alabama 36602
kjr@alaconsumerlaw.com

s/Kenneth A. Watson
KENNETH A. WATSON

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SUPERIOR ENERGY SERVICES, L.L.C., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NO. 09-321-KD-C |
| | * | |
| BOCONCO, INC., | * | |
| | * | |
| Defendant. | * | |

## AFFIDAVIT OF DWAYNE BOUDREAUX

STATE OF LOUISIANA
PARISH OF JEFFERSON

I, Dwayne Boudreaux, being duly sworn do depose and say as follows:

1.      My name is Dwayne Boudreaux. I am over the age of twenty-one (21) years and a resident of LaFourche Parish, Louisiana. I am employed by Superior Energy Services, L.L.C. ("Superior"). At all times material hereto, I was Director of Operations for Superior. In that capacity I was one of Superior's representatives who worked directly with representatives of Boconco in the construction of four lift boats known as Hulls 128, 129, 130, and 131. As a result, I have personal knowledge of the matters stated herein.

2.      On November 17, 2006, Boconco and Moreno Energy, Inc. ("Moreno"), entered into contracts under which Boconco was to construct two lift boats designated as Hull 128 and Hull 129. While Hulls 128 and 129 were under construction, on April 23, 2008, Superior, Moreno and Boconco entered into contracts for Boconco to construct two additional lift boats designated as Hull 130 and Hull 131. Also on April 23,

2008, Superior and Moreno entered into an Assignment and Assumption Agreement under which Superior initially acquired a 50% interest in the contracts for the construction of Hulls 128 and 129. Superior ultimately acquired the rights of Moreno entirely as to Hulls 128, 129, 130, and 131.

3.     In working with Boconco's representatives I primarily dealt with Kenny Bosarge and his brother, Rusty Bosarge. Both Kenny and Rusty held themselves out as authorized to speak for Boconco on all matters we discussed.

4.     Both prior to and after acquiring an interest in the hulls from Moreno, Superior inspected Hulls 128 and 129 which were then under construction. At that time, Boconco had already installed six 175 kw gensets ("175s") on Hulls 128 and 129. Four 175s (two on each hull) had been installed as the main generators, and two 175s (one on each hull) had been installed as emergency generators.

5.     After acquiring an interest in the vessels, Superior did require some changes in the construction. Among those changes was the replacement of the four 175s made the subject of this suit with larger generators.     In June 2008, Superior conducted load analyses and determined the 175s were not sufficient to power the vessels as main generators. Accordingly, Superior required that the four 175s be replaced with four larger 300 kw gensets.

6.     Initially, Boconco, through Kenny Bosarge, objected and stated that the 175s had been specified and agreed to in the contract and thus Boconco should have no burden for the upgrade. This was in mid-June, 2008. I told Mr. Bosarge that I understood his position and would report the same to my superiors. Mr. Bosarge and I later discussed whether Superior would receive an offset against the purchase price of

Hulls 128 and 129. Although no agreement was made at that time, the gist of our conversation was that if Superior received an offset the 175s would belong to Boconco, but if Superior did not receive an offset they would belong to Superior. The 300 kw gensets arrived at the shipyard in early August, 2008 and Boconco then removed the four 175s from Hulls 128 and 129. At that time, I had an additional discussion with Kenny Bosarge on Boconco's yard in which we agreed (1) that Superior would pay for the 300 kw generators which would replace the 175s being removed from Hulls 128 and 129; (2) that Superior would pay Boconco for the work in removing the 175s and other work necessary to retrofit the 300 kw gensets to the hulls; (3) that there would be no offset against the purchase price of Hulls 128 and 129 for the 175s even through they would not be used in the construction of those hulls; and (4) accordingly, the four 175s removed from Hulls 128 and 129 would be the property of Superior. Actually, my statement to Mr. Bosarge was something to the effect of "There is no problem, Kenny, we [Superior] will pay for the 300s, pay you to remove the 175s and install the 300s, and take no offset for the 175s, but those will be our gensets." With this assurance Mr. Bosarge, on behalf of Boconco, agreed that upon removal of the 175s from Hulls 128 and 129 the same were the property of Superior.

7.     At that time there also were discussions, which included Chuck Castro of Thompson Tractor ("Thompson"), about what uses or other disposition Superior might make of the 175s.   Superior was concerned about the manufacturer's warranty beginning to run and thus it was agreed the 175s would be returned to Thompson's warehouse. It was discussed that Superior would later provide two of those 175s to be used as emergency generators on Hulls 130 and 131. With respect to the other two

175s we discussed with Mr. Castro the potential for those gensets to be sold to another party for Superior's credit and we also discussed converting those 175s to stand-alone, portable generator units which Superior could use elsewhere in its operations. Mr. Bosarge participated in these discussions with Thompson concerning the disposition of the four 175s removed from Hulls 128 and 129. Consistent with Boconco's agreement that those gensets belonged to Superior, Mr. Bosarge never expressed any opposition to Superior's control over the disposition of the 175s.

8.     Attached as Exhibit A is a document produced by Thompson in this case which I believe are notes made by Mr. Castro during our discussion. The C9s referred to in Mr. Castro's notes are the 175s at issue. The notes are consistent with the agreement we made with Boconco and the potential dispositions being considered by Superior. Subsequently, however, Superior terminated the contracts for the construction of Hulls 130 and 131. At the time those contracts were terminated Boconco had not reached the stage of construction at which the generators would have been installed and therefore all four 175 kw gensets remained at Thompson's warehouse.

9.     In December, 2008, change orders were executed consistent with the agreement that was reached in August. Attached hereto as Exhibit B is change order 17 for Hull 128 and change order 17 for Hull 129 providing for an increase in the purchase price of those hulls in the amount of $110,000 to upgrade the main panels to support the 300 kw generators. Also attached as part of Exhibit B is change order 18 for Hull 128 and change order 18 for Hull 129 adding $31,680 to the price of those hulls for work relating to the removal of the 175s and the installation of the 300 kw gensets.

These change orders expressly note that "Customer supplied the 300 kw generators." Each of these change orders is signed by me on behalf of Superior (Customer), Wannan "Rusty" Bosarge on behalf of Boconco, and Michael Debaillon on behalf of Moreno. Neither these change orders nor any other change order gave Superior an offset against the purchase price of Hulls 128 and 129 for the four 175s not used in the construction of those hulls, which is consistent with our agreement that the 175s were the property of Superior.

10. Attached hereto as Exhibit C is the contract for the construction of Hull 128. Attached as Exhibit D is the contract for the construction of Hull 129. Attached as Exhibit E is an Estoppel and Consent Certificate executed by Boconco on or about April 23, 2008 when Superior acquired an interest in those hulls. The contract price for Hull 128 was $19,100,000 and $17,900,000 for Hull 129. The installation of the six 175s was part of the work comprising the fifth progress payment provided for in these contracts entitled "setting of main engines." As shown in the Estoppel and Consent Certificate (Exhibit E) executed by Boconco, at the time Superior acquired an interest in the hulls Boconco had received all of the progress payments through the fifth progress payment, including the setting of the main engines and installation of the 175s. Specifically, in paragraph (d) Boconco acknowledges receipt of $15,727,918 on Hull 128, which comprises the 80% of the contract price which was contemplated to paid through the fifth progress payment, $15,280,000, plus payments for change orders in the amount of $447,918, and on Hull 129 had been paid $14,767,918, again 80% of the contract price as contemplated through the fifth progress payment, $14,320,000, plus change orders in the amount of $447,918. Likewise, paragraph (e) shows that Boconco

acknowledged that the progress payments remaining to be made were the sixth, seventh and eighth payments, totaling $3,820,000 on Hull 128 and $3,580,000 on Hull 129.

11.    I am aware of the invoices referred to in paragraph 15 of the affidavit of Wannan "Rusty" Bosarge in support of Boconco's motion for summary judgment, but which Boconco did not attach to Mr. Bosarge's affidavit. Attached hereto as Exhibit F are the invoices referred to by Mr. Bosarge which are dated June 9, 2009. These "invoices" are dated and were issued by Boconco after Superior terminated the contracts for Hulls 130 and 131 and after Superior had already sued Boconco in this case. As shown by Exhibit G, through our counsel, Superior immediately rejected these invoices as inconsistent with the contracts and otherwise inaccurate. The invoices in no way support the assertion that Superior owed money to Boconco on Hulls 128 and 129. In fact, those invoices are given specific treatment in paragraph 5(b) of the settlement agreement between Superior and Boconco (previously filed with the Court under seal) and those invoices were rescinded.

12.    It is true that I was directly and significantly involved in the consummation of the settlement agreement between Superior and Boconco.  It also is true that ownership of the four 175s was not made a subject of the settlement agreement. The reason the 175s were not a subject of the settlement agreement is because, as explained above, the parties had already agreed they were the property of Superior and Superior had possession thereof through Thompson. There simply was no reason to address the 175s in the settlement agreement. However, in the process of inventorying materials and equipment which needed to be transferred to Superior, I found on

Boconco's yard the cooling towers (radiators) for the four 175s in storage with Thompson. I discussed the cooling towers with Kenny Bosarge and told him those were the cooling towers for Superior's 175s stored at Thompson. Mr. Bosarge agreed and thus the cooling towers were included Schedule 1 of the settlement agreement. Mr. Bosarge made no assertion that the 175s belonged to Boconco and thus Boconco was retaining the cooling towers. In fact, no one with Boconco made any claim to ownership of the 175s until after the settlement agreement was consummated.

Further affiant sayeth not.

DWAYNE BOUDREAUX

Sworn to and subscribed before me this *19th* day of *September*, 2010.

NOTARY PUBLIC

My Commission Expires: _____

STACI SHINOGLE   .
NOTARY PUBLIC
NOTARY ID NUMBER : 85406
JEFFERSON PARISH, LA
MY COMMISSION ISSUED FOR LIFE

Boronco

Return  2 — C9 an start Gens for warehousing and sell to interested party.

Return  2 — C9 24V for Keeping until Hull 130 + 131 are required.

Sell  4  < 18's to replace < —9's, hulls 130 + 131.



THOMPSON000201



# CHANGE ORDER

**Hull:** 128

**Change Order:** 17

**Date:** 29, Dec 2008

**Customer:** MORENO ENERGY, INC.

## MAIN PANEL CHANGE

**DESCRIPTION:**

Change main panel from support of 175 K.W. Generators to 300 K.W. Generator support this is for the main panel only.

**COST:**

Total cost of change.............................................$ 110,000.00

**SCHEDULE IMPACT:**

This change adds (time to approve drawings from A.B.S. And U.S.C.G. only) days to the contractual delivery date. The new delivery date is _____.

**NOTES:**     Payment is due on approval by Customer.

Customer Signature:

_____
Michael J. Debaillon
MORENO ENERGY, INC.

Builder Signature:

_____
Warman W. Bosarge, Jr.
BOCONCO, INC.



# CHANGE ORDER

Hull: 129

Change Order: 17

Date: 29, Dec 2008

Customer: MORENO ENERGY, INC.

## MAIN PANEL CHANGE

DESCRIPTION:

Change main panel from support of 175 K.W. Generators to 300 K.W. Generator support this is for the main panel only.

COST:

Total cost of change...........................................$ 110,000.00

SCHEDULE IMPACT:

This change adds (time to approve drawings from A.B.S. And U.S.C.G. only) days to the contractual delivery date. The new delivery date is _____.

NOTES:        Payment is due on approval by Customer.

Customer Signature:                               Builder Signature:

Michael J. Debaillon                              Warren W. Bosarge, Jr.
MORENO ENERGY, INC.                               BOCONCO, INC.



## CHANGE ORDER

Hull: 128

Change Order: 18

Date: 29, Dec 2008

Customer: MORENO ENERGY, INC.

### REMOVAL AND REPLACEMENT OF GENERATORS CHANGE

DESCRIPTION:

Change main generators from 175 K.W. To 300 K.W. Customer supplied the 300 K.W. Generators.
Remove and replacement of: Cooling pipes, Ballast pumps, Air lines, Exhaust Connections, Cut and remove stairway, Cut Bulkhead, and install movement lugs.

COST:

Total cost of change...............................$ 31,680.00

SCHEDULE IMPACT:

This change adds (time to approve drawings from A.B.S. And U.S.C.G. only) days to the contractual delivery date. The new delivery date is _____.

NOTES:    Payment is due on approval by Customer.

Customer Signature:

Michael J. Debaillon
MORENO ENERGY, INC.

Builder Signature:

William W. Bosarge, Jr.
BOCONCO, INC.



## CHANGE ORDER

Hull: 129

Change Order: 18

Date: 29, Dec 2008

Customer: MORENO ENERGY, INC.

### REMOVAL AND REPLACEMENT OF GENERATORS CHANGE

DESCRIPTION:

Change main generators from 175 K.W. To 300 K.W. Customer supplied the 300 K.W. Generators.
Remove and replacement of: Cooling pipes, Ballast pumps, Air lines, Exhaust Connections, Cut and remove stairway, Cut Bulkhead, and install movement lugs.

COST:

Total cost of change...............................................$ 31,680.00

SCHEDULE IMPACT:

This change adds (time to approve drawings from A.B.S. And U.S.C.G. only) days to the contractual delivery date. The new delivery date is _____.

NOTES:    Payment is due on approval by Customer.

Customer Signature:

_____
Michael N. Debaillon
MORENO ENERGY, INC.

Builder Signature:

_____
Wannan W. Bosarge, Jr.
BOCONCO, INC.



# HULL 128

# VESSEL CONSTRUCTION CONTRACT

### PREPARED FOR:

## MORENO ENERGY, INC.

### 17 NOVEMBER 2006



EXHIBIT "C"

THIS AGREEMENT made and entered into this 17ᵗʰ day of November, 2006 by and between Moreno Energy, Inc., whose address is 600 Jefferson Street Suite 1403, Lafayette, Louisiana 70501, hereinafter called Customer, and BOCONCO, Inc., whose address is 14530 Shell Belt Road, Bayou La Batre, Alabama 36509, hereinafter called Builder,

## WITNESSETH:

### ONE
### SUBJECT MATTER

Builder agrees to construct for Customer at its yard in Bayou La Batre, Alabama, and deliver one steel Lift Boat vessel, approximately 145'-0" in length, 110'-0" in width, and 12'-6" in depth, with 265' leg lengths in accordance with the Specifications furnished by Builder attached hereto as Exhibit A, referred to as the "Specifications" (hereinafter the "vessel"). Said vessel shall be designated as "Hull Number 128." Builder agrees to furnish (except such items, if any, as are being furnished by Customer as called for in the Specifications) and install all items listed on the Specifications. All materials shall be new, and all work shall be accomplished in a good and workmanlike manner and in accordance with good marine practice. All paint shall be of good marine quality and shall be applied in accordance with the manufacturer's specifications or recommendations. Any conflict between the Specifications and this contract shall be resolved in favor of this contract.

### TWO
### CONSIDERATION AND PROGRESS

Customer agrees to pay Builder for the construction of the vessel covered by this contract the total sum of $~~18,500,000.00~~ Dollars (the "Purchase Price") payable at the following times:    $19,100,000.00

| | | |
|---|---|---|
| 1ˢᵗ Payment: | UPON SIGNING THE CONTRACT | 15% |
| 2ⁿᵈ Payment: | LAYING OF KEEL | 20% |
| 3ʳᵈ Payment: | HULL PLATING COMPLETE | 20% |
| 4ᵗʰ Payment: | SETTING OF TOWERS | 15% |
| 5ᵗʰ Payment: | SETTING OF MAIN ENGINES | 10% |
| 6ᵗʰ Payment: | LAUNCH OF VESSEL | 10% |
| 7ᵗʰ Payment: | SETTING OF 200 TON CRANE | 5% |
| 8ᵗʰ Payment: | BALANCE AT DELIVERY OF VESSEL | 5% |

Customer acknowledges and agrees that the foregoing list of benchmarks for progress payments are not necessarily stated in chronological order, that these

1

benchmarks may be achieved in different order and that more than one benchmark may be achieved and progress payments due on the same date. No more than three payments shall become due in any fourteen day period.

Unless otherwise agreed to in writing by Builder, all payments shall be made by wire transfer to Builder's account, as per attached instructions. Builder shall notify Customer in writing by facsimile when each benchmark has been reached, and Customer shall thereafter effect wire transfer of the respective payment(s) due Builder before the end of the second business day after the date of notice. Customer's obligation to pay the aggregate sum set forth above shall not in any way depend upon whatever financial commitments Customer may have from others.

In order to effect all progress payments as set forth hereinabove, the following procedures shall take place: Except with respect to the first progress payment, Builder will provide Customer with no less than seven (7) days notice of the anticipated reaching of a payment benchmark. No invoice for any progress payment shall be delivered by Builder to Customer until seven (7) days from receipt of such notice.

If requested, Builder will furnish to Customer with each invoice a certification to Customer (and, if requested by Customer, to Customer's lender) certifying to the following effects: (a) that there are no liens against the vessel arising through Builder, other than those material man's and mechanic's liens arising in connection with construction of the vessel to the extent, and only to the extent, that such material man's and mechanic's liens arise in connection with the payment obligations of Customer to Builder under this contract and not yet performed by Customer; (b) that neither the vessel, or any part thereof, nor any of the equipment or any other property to be installed thereon or attached thereto has suffered any material damage by fire or any other casualty or otherwise; (c) that Builder is not in default under this contract; and (d) that all work and items for which payment is being made has been done, including installation or ordering of any materials as specified, and has been satisfactorily completed and, to the extent required by this contract, have been incorporated into the vessel or are located at Builder's shipyard.

### THREE
### INSPECTION

Builder will furnish reasonable space at its shipyard for a duly authorized representative of Customer (and/or Customer's lender) who shall have reasonable access to the work of Builder during working hours of the shipyard. Customer's representative shall inspect and accept all workmanship, components and materials which are in conformity with the Specifications and shall, within a reasonable amount of time, reject all workmanship, components and materials which do not comply with the Specifications, provided that any inspection or failure to inspect or failure to reject workmanship and material by Customer's representative shall not prejudice the rights of Customer under the provisions of this contract.

2

All fuel and water tanks and associated piping shall be air tested. Any leaks found will be rewelded/resealed and · retested. All piping shall have sufficient bracing/bracketing to prevent failure. Customer or Customer's representative shall have the right to witness all air tests and inspect piping and pipe bracing/bracketing at time of test(s), or prior to any area(s) being "closed in". The Builder shall provide Customer at least two (2) days notice of air tests or "close-ins". Customer has the right to inspect the vessel immediately prior to launching. Builder will provide Customer with at least two (2) days notice of launching.

## FOUR
### DELIVERY AND ACCEPTANCE

Builder shall deliver the vessel on or before 550 calendar days after the date hereof; provided, however, that Builder will not be responsible for any ·delay caused by Customer or in· case of the occurrence of any delay beyond the control of the Builder because of the following force majeure events: non-delivery and late delivery of materials, parts and equipment and transportation delays; Government priorities and intervention by and delays caused by civil, naval and military authorities; acts of God (other than ordinary storms or inclement weather conditions); named storms, earthquakes, explosions, lightning, flood and fire; strikes, labor difficulties and shortages, and other industrial disturbances; riots, insurrections and war; sabotage, vandalism, blockades, embargoes and epidemics; and events of a similar nature. Shortages of skilled workmen shall not be considered a cause for delay in delivery of the vessel, notwithstanding the foregoing.

Written notice of any excusable or non-excusable delay and of the anticipated effect thereof shall within five (5) days after knowledge of same, be given by the Builder to the Customer, and the delivery date of said vessel shall be extended accordingly. Should Builder fail to give such written notice of an excusable delay, such a delay shall be treated as a non-excusable delay. Should a delay in the delivery of the vessel be due to causes not one of the excusable delays set forth above, Customer shall not be excused from the Customer's obligation to accept and pay for said vessel, but Customer shall be entitled to recover liquidated damages from Builder at the rate of $2,150.00 for each day delivery is delayed. The liquidated damages provided hereunder shall be the Customer's sole remedy for any failure to timely deliver the vessel and Builder shall not be liable for any consequential or incidental damages.

Should the actual date of delivery and acceptance of the vessel be delayed more than sixty (60) calendar days from the date of delivery stipulated hereinabove due to causes not one of the excusable delays set forth above, upon payment to Builder of all progress payments then due to Builder, Customer shall have the right, at its option, to terminate this contract by providing written notice to Builder and have the vessel completed by another shipyard. In such event, Builder grants Customer and its designee an irrevocable license to use all Specifications necessary to complete the performance of this contract.

3

# FIVE
## DELIVERY AND ACCEPTANCE AND RISK OF LOSS

The vessel shall be delivered safely afloat to the Customer at the Builder's dock at Bayou La Batre, AL.  Upon completion of reasonable sea trials satisfactory to Customer, Customer shall visually inspect said vessel.  If inspection indicates no apparent defect, and if the vessel has been completed in compliance with this contract, including the requirements in Paragraph Thirteen, Customer agrees to accept delivery within three (3) days of the completion of the sea trials and the completion of the construction of the vessel.  Buyer shall not unreasonably withhold acceptance of the vessel.  Customer agrees to sign a written acceptance to evidence Customer's acceptance of the vessel.  All risk of loss shall pass to Customer upon delivery and acceptance.

If Customer does not accept the vessel, Customer shall notify Builder in writing, within three (3) days of the completion of the sea trials, of the exact nature of any defect(s) or fault(s) at that time that constitutes a refusal to accept such vessel.  Customer shall give Builder a reasonable time within which to correct such defect(s) not to exceed 30 days after receipt of written notice of same.  Upon satisfactory correction of such defect(s) or fault(s), and if no other defects or deficiencies are then existing, Customer shall immediately accept the vessel.  In the event Customer and Builder are unable to agree that the reason for refusing to accept the vessel constitutes a fault or defect, the dispute shall be resolved in accordance with Paragraph Fifteen below.

If the vessel is destroyed prior to delivery and acceptance, this contract shall terminate, and Customer's sole remedy shall be the refund of all payments made hereunder and the refund of the cost of Customer's furnished equipment.  Builder agrees to indemnify, defend and hold harmless the Customer, its officers, directors, employees and representatives, of and from any and all claims for damages arising from injuries to any person or property occurring in, about or connected with the building, launching or trials of the vessel during the period prior to the delivery of the vessel and acceptance thereof by Customer, howsoever caused, including strict liability (including defects that pre-exist the date of this contract), fault and negligence of Customer.  Customer's subcontractors shall give proof of prior insurance to commencing work on the hull.  If any subcontractor of Customer lacks insurance, Customer shall have the option of obtaining a new subcontractor or agreeing to indemnify Builder from claims from said subcontractor.

Upon delivery to Builder by Customer or Customer's representative of any Customer supplied documents, materials and equipment as called for by the Specifications, Builder shall take possession of such items and adequately and properly store and maintain those items.  Any costs of repair to or replacement of such items necessitated by any damage to or loss of such items which occurs after delivery by the Customer of the items to Builder shall be borne entirely by Builder.

4

# SIX
## CHANGE ORDERS

Customer may at any time propose alternations and deletions, except as to increase in the vessel's dimensions, to the work to be performed without invalidating this contract. Any change requested shall be submitted in writing by Customer to the Builder specifying in complete detail the items of material and work to be accomplished, at which time the Builder will price out the change and present it to customer for approval and payment. Unless otherwise agreed by the Builder in writing, full payment is to be made by Customer before the change is made. Builder may substitute other sizes and types of material for that specified, providing the same is of equal quality, strength, and suitability for the use intended, with prior written Customer approval. If a change involves a delay in completion, Builder shall not be liable to Customer for liquidated damages for any delay or late delivery occasioned thereby. Approval of a deletion or addition, the change in cost therewith, and the time involved in delaying completion because of said change shall be authorized only by Customer and accepted by Customer and Builder in writing.

# SEVEN
## INSURANCE

Builder will assume all risks of loss as to all persons, materials, machinery, parts and equipment of the vessel during the construction and until completion and delivery to the Customer and acceptance thereof. During the construction period and until delivery and acceptance, Builder shall maintain Builder's Risk Insurance on the vessel and all components and material.

Until the vessel has been completed, physically delivered and accepted by Customer, the vessel and materials, outfit, equipment and appliances to be installed in the vessel, including all materials, outfit, equipment and appliances provided by Customer and delivered to Builder's yard for and used or to be used on the construction thereof shall, at the expense of the Builder, be kept fully insured under standard Builder's Risk Insurance Policy. The amount of such insurance shall not be less than the aggregate of the amounts to be paid to Builder by Customer, plus the value of any materials, outfit, equipment and appliances furnished by Customer, whether installed or stored in Builder's yard. As its interest may appear, Customer shall be a loss payee on said policy to the extent of payments made by Customer to Builder hereunder plus the value of any such materials, outfit, equipment and appliances furnished by Customer.

Builder shall also purchase and maintain, at its expense, during the life of this contract, Workman's Compensation Insurance, with United States Longshoremen's and Harbor Workers endorsement, in customary amounts and Commercial General Liability Insurance, including contractual liability coverage for Builder's indemnity obligations in this contract, with limits of not less than One Million ($1,000,000.00) for each bodily injury or death per person and with limits of not less than Five Hundred Thousand Dollars ($500,000.00) for property damage. Customer shall be added as an additional insured in the Commercial Liability policy and all excess or umbrella policies. Builder



shall require all of its subcontractors to have the same workers' compensation and general liability insurance Builder is required to maintain hereunder.

## EIGHT
## DEFAULT

If any of the following events shall occur:

(a) The Customer shall fail to make any payment when due under this contract or fail to accept delivery of the vessel completed in accordance with this contract and such failure shall continue for more than thirty (30) days after the Builder shall have given notice thereof to the Customer; or

(b) The Customer or Builder shall file a voluntary petition in bankruptcy or shall be adjudicated bankrupt or insolvent, or shall file a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any federal, state or other law or regulation, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of itself or of all or any substantial part of its assets, or shall make any general assignment for the benefit of creditors, or shall liquidate or dissolve; or

(c) A petition shall be filed against the Customer or Builder seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal, state or other law or regulation, and such petition shall remain undismissed or unstayed for an aggregate of forty-five (45) days, or if any trustee, receiver or liquidator of the Customer or of all or any substantial part of its properties shall be appointed without the consent or acquiescence of the Customer and such appointment shall remain unvacated or unstayed for an aggregate of forty-five (45) days; or

(d) Builder shall fail to execute the contract work in accordance with specified work schedule or otherwise to comply with any of its obligations under this contract (except and to the extent that such failure is due to force majeure or excusable delays as provided in paragraphs Four and Six respectively) and such failure shall continue for more than thirty (30) days after the Customer shall have given written notice thereof to Builder;

Then in any such event, the party not in default may terminate this contract by written notice to the other. Upon termination, the terminating party shall retain all right to damages from any default resulting in termination and may exercise all rights and

6

remedies available to it at law, in equity, or otherwise, in connection with said default except as otherwise provided in this Agreement.

## NINE
### CONSTRUCTION OF CONTRACT

This contract shall be construed according to the laws of the State of Alabama.

## TEN
### SECURITY FOR PAYMENT

The Customer shall have, and the Builder hereby grants to Customer, a security interest in the uncompleted vessel during all stages of its construction from the inception until delivery and passage of title to the Customer. Said security interest shall cover the uncompleted vessel, and all parts, equipment, and material designated to be used in the construction of said vessel, including Customer-supplied equipment, and shall be construed in accordance with the provisions of Article 9 of Title 7A of the Code of Alabama (1975), which is known and cited as Uniform Commercial Code – Secured Transactions. This security interest shall secure to Customer the advance or advances which it is making to Builder as provided in the payment section of this contract, which money shall be used by Builder for the payment of expenses incurred in the building of the vessel, including, but not limited to, a pro rata portion of overhead expenses of the Builder. Builder warrants that all monies received from Customer pursuant to this contract will be so utilized in order to ensure that the security interest created hereby in favor of Customer shall be a purchase money security interest within the meaning of the Uniform Commercial Code – Secured Transactions.

Builder will execute all documents and cooperate fully in order that Customer may duly perfect the security right created hereunder.

Builder warrants that Builder will pay its suppliers and workmen on time for all materials, equipment and labor which go into the construction of the vessel and that its books and records reflecting that these debts are kept current will be made available for reasonable inspection by the Customer. Builder also warrants that, insofar as is reasonably practical, all equipment and materials purchased for use in the construction of the vessel will be marked, tagged or stored in such a manner that they may be readily identifiable as destined for use in the vessel.

Builder warrants that the security interest given to Customer by this contract will be superior to all other security interests in the secured property.

7

## ELEVEN
## ASSIGNMENT

This contract may not be assigned by Customer or Builder without the prior written consent of the other; provided, however, this contract may be assigned by Customer to an affiliate of Customer without Builder's consent so long as Customer at all times remains fully responsible for the full payment and performance of this contract.

## TWELVE
## COMMISSIONS

Should any third party claim any fee or commission as a result of any prior agreement with Customer or Builder, Customer and Builder agree that the party who entered the agreement with such third party shall indemnify, protect and hold the other harmless from and against any claim asserted by such third party.

## THIRTEEN
## DOCUMENTS

Upon delivery of said vessel and acceptance thereof by Customer, Builder shall execute and deliver all documents and certificates required in the Specifications. Builder hereby warrants to Customer that upon delivery of said vessel and acceptance thereof by Customer, said vessel will be free and clear of and from all debts, encumbrances, liens and claims of liens, charges, assessments, taxes and liens of whatsoever kind or nature, maritime or otherwise, except as may have been created by Customer. At delivery, the Builder, at Builder's expense, shall cause the vessel to be certified by the Coast Guard as set forth in the Specifications. Builder will, at its cost, cure any defect in the Specifications or construction which causes the vessel not to be certifiable.

## FOURTEEN
## WARRANTIES

Builder hereby assigns and shall assign all subcontractor and manufacturer's warranties for all parts and labor to Customer.

(a) Construction Warranty: Builder warrants that, if at any time within one hundred eighty (180) days after delivery of the vessel there shall appear or be discovered in such vessel any defect in any Builder (including subcontractors of Builder) furnished workmanship or material or the design of the vessel, whether latent or patent (hereinafter called a "Construction Deficiency"), such Construction Deficiency shall be repaired or replaced by Builder, at Builder's expense, to the requirements of this contract and the Specifications. Builder shall be responsible for the cost of correcting any such Construction Deficiency only to the extent that the same resulted from

8

defective workmanship or material and not from ordinary wear and tear, or the negligence of improper act of Customer or any other person other than the Builder or its subcontractors, or from or as a result of latent defects or deficiencies in the equipment or materials furnished by Customer. Any work required to be performed to correct a Construction Deficiency for which Builder is liable hereunder shall be carried out at Builder's shipyard if practical. Where, it would be impractical to return the vessel to Builder's yard for repairs or replacements under this warranty, Customer may contract to have such work performed by another recognized shipyard or ship repair facility in relative proximity to the location of the vessel, and Builder shall be responsible only for a sum representing no more than the cost of corrections at straight time commercial shipyard or ship repair yard rates charged by Builder or prevailing on the coast of the Gulf of Mexico. In the event Customer elects to have any work required to be performed to correct a Construction Deficiency, Builder shall be notified three (3) days prior to the commencement of the work. Such notifications shall include description of the claimed deficiency, location of the vessel, and the company selected to perform the work. The one hundred eighty (180) day Construction Warranty constitutes Builder's sole warranty with respect to the quality, design, manufacture and fitness of said vessel.

(b) Other Warranty Matters: It is expressly provided that Builder does not warrant machinery, equipment and fittings purchased by Builder for installation in the vessel, but hereby extends and assigns the manufacturer's and/or supplier's warranty or guarantee, if any, to Customer. Builder will execute all documents to effectuate the assignment(s) required and will cooperate fully in order for Customer to receive the benefit of the assignment(s). Builder will be responsible for proper installation of said equipment purchased by Builder and installed in the vessel.

Except as otherwise provided in this contract, Builder makes no other warranty of any kind whatsoever, express or implied; and all implied warranties of workmanship, merchantability, and fitness for a particular purpose which exceed the warranties provided herein are hereby disclaimed by Builder and excluded from this contract. Furthermore, Builder shall have no liability under any circumstances for negligence or manufacturer's strict liability in connection with the design, manufacture or sale of the vessel other than the express warranties given herein.

## FIFTEEN
## FORUM SELECTION

All disputes, controversies or differences which may arise between Builder and Customer out of or in relation to or in connection with this contract, or for the breach

thereof, or for injunctive relief shall be resolved in U.S. District Court for the Southern District of Alabama.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed, this 17th day of November, 2006.

Customer's Signature:

Builder's Signature:

_____
Michel B. Moreno
President
Moreno Energy, Inc.

_____
Wannan W. Bosarge, Jr.
President
BOCONCO, Inc.

Witness Signatures:

_____

_____

_____

_____



**BOCONCO**
INCORPORATED

Wire Transfer Information:
AmSouth Bank
ABA #062000019
Account # 40694399

10



# HULL 129

# VESSEL CONSTRUCTION CONTRACT

## PREPARED FOR:

## MORENO ENERGY, INC.

## 17 NOVEMBER 2006



EXHIBIT
"D"

THIS AGREEMENT made and entered into this 17th day of November, 2006 by and between Moreno Energy, Inc., whose address is 600 Jefferson Street Suite 1403, Lafayette, Louisiana 70501, hereinafter called Customer, and BOCONCO, Inc., whose address is 14530 Shell Belt Road, Bayou La Batre, Alabama 36509, hereinafter called Builder,

## WITNESSETH:

### ONE
### SUBJECT MATTER

Builder agrees to construct for Customer at its yard in Bayou La Batre, Alabama, and deliver one steel Lift Boat vessel, approximately 145'-0" in length, 110'-0" in width, and 12'-6" in depth, with 265' leg lengths in accordance with the Specifications furnished by Builder attached hereto as Exhibit A, referred to as the "Specifications" (hereinafter the "vessel"). Said vessel shall be designated as "Hull Number 129." Builder agrees to furnish (except such items, if any, as are being furnished by Customer as called for in the Specifications) and install all items listed on the Specifications. All materials shall be new, and all work shall be accomplished in a good and workmanlike manner and in accordance with good marine practice. All paint shall be of good marine quality and shall be applied in accordance with the manufacturer's specifications . or recommendations. Any conflict between the Specifications and this contract shall be resolved in favor of this contract.

### TWO
### CONSIDERATION AND PROGRESS

Customer agrees to pay Builder for the construction of the vessel covered by this contract the total sum of $18,500,000.00 Dollars (the "Purchase Price") payable at the following times:    $17,900,000.00 /132 VAT

1st Payment:   UPON SIGNING THE CONTRACT...................................................... 15%

2nd Payment:   LAYING OF KEEL........................................................................... 20%

3rd Payment:   HULL PLATING COMPLETE............................................................ 20%

4th Payment:   SETTING OF TOWERS................................................................... 15%

5th Payment:   SETTING OF MAIN ENGINES ....................................................... 10%

6th Payment:   LAUNCH OF VESSEL .................................................................. 10%

7th Payment:   SETTING OF 200 TON CRANE ...................................................... 5%

8th Payment:   BALANCE AT DELIVERY OF VESSEL ............................................. 5%

Customer acknowledges and agrees that the foregoing list of benchmarks for progress payments are not necessarily stated in chronological order, that these

1

benchmarks may be achieved in different order and that more than one benchmark may be achieved and progress payments due on the same date. No more than three payments shall become due in any fourteen day period.

Unless otherwise agreed to in writing by Builder, all payments shall be made by wire transfer to Builder's account, as per attached instructions. Builder shall notify Customer in writing by facsimile when each benchmark has been reached, and Customer shall thereafter effect wire transfer of the respective payment(s) due Builder before the end of the second business day after the date of notice. Customer's obligation to pay the aggregate sum set forth above shall not in any way depend upon whatever financial commitments Customer may have from others.

In order to effect all progress payments as set forth hereinabove, the following procedures shall take place: Except with respect to the first progress payment, Builder will provide Customer with no less than seven (7) days notice of the anticipated reaching of a payment benchmark. No invoice for any progress payment shall be delivered by Builder to Customer until seven (7) days from receipt of such notice.

If requested, Builder will furnish to Customer with each invoice a certification to Customer (and, if requested by Customer, to Customer's lender) certifying to the following effects: (a) that there are no liens against the vessel arising through Builder, other than those material man's and mechanic's liens arising in connection with construction of the vessel to the extent, and only to the extent, that such material man's and mechanic's liens arise in connection with the payment obligations of Customer to Builder under this contract and not yet performed by Customer; (b) that neither the vessel, or any part thereof, nor any of the equipment or any other property to be installed thereon or attached thereto has suffered any material damage by fire or any other casualty or otherwise; (c) that Builder is not in default under this contract; and (d) that all work and items for which payment is being made has been done, including installation or ordering of any materials as specified, and has been satisfactorily completed and, to the extent required by this contract, have been incorporated into the vessel or are located at Builder's shipyard.

## THREE
### INSPECTION

Builder will furnish reasonable space at its shipyard for a duly authorized representative of Customer (and/or Customer's lender) who shall have reasonable access to the work of Builder during working hours of the shipyard. Customer's representative shall inspect and accept all workmanship, components and materials which are in conformity with the Specifications and shall, within a reasonable amount of time, reject all workmanship, components and materials which do not comply with the Specifications, provided that any inspection or failure to inspect or failure to reject workmanship and material by Customer's representative shall not prejudice the rights of Customer under the provisions of this contract.



All fuel and water tanks and associated piping shall be air tested. Any leaks found will be rewelded/resealed and retested. All piping shall have sufficient bracing/bracketing to prevent failure. Customer or Customer's representative shall have the right to witness all air tests and inspect piping and pipe bracing/bracketing at time of test(s), or prior to any area(s) being "closed in". The Builder shall provide Customer at least two (2) days notice of air tests or "close-ins". Customer has the right to inspect the vessel immediately prior to launching. Builder will provide Customer with at least two (2) days notice of launching.

## FOUR
### DELIVERY AND ACCEPTANCE

Builder shall deliver the vessel on or before 550 calendar days after the date hereof; provided, however, that Builder will not be responsible for any delay caused by Customer or in case of the occurrence of any delay beyond the control of the Builder because of the following force majeure events: non-delivery and late delivery of materials, parts and equipment and transportation delays; Government priorities and intervention by and delays caused by civil, naval and military authorities; acts of God (other than ordinary storms or inclement weather conditions); named storms, earthquakes, explosions, lightning, flood and fire; strikes, labor difficulties and shortages, and other industrial disturbances; riots, insurrections and war; sabotage, vandalism, blockades, embargoes and epidemics; and events of a similar nature. Shortages of skilled workmen shall not be considered a cause for delay in delivery of the vessel, notwithstanding the foregoing.

Written notice of any excusable or non-excusable delay and of the anticipated effect thereof shall within five (5) days after knowledge of same, be given by the Builder to the Customer, and the delivery date of said vessel shall be extended accordingly. Should Builder fail to give such written notice of an excusable delay, such a delay shall be treated as a non-excusable delay. Should a delay in the delivery of the vessel be due to causes not one of the excusable delays set forth above, Customer shall not be excused from the Customer's obligation to accept and pay for said vessel, but Customer shall be entitled to recover liquidated damages from Builder at the rate of $2,150.00 for each day delivery is delayed. The liquidated damages provided hereunder shall be the Customer's sole remedy for any failure to timely deliver the vessel and Builder shall not be liable for any consequential or incidental damages.

Should the actual date of delivery and acceptance of the vessel be delayed more than sixty (60) calendar days from the date of delivery stipulated hereinabove due to causes not one of the excusable delays set forth above, upon payment to Builder of all progress payments then due to Builder, Customer shall have the right, at its option, to terminate this contract by providing written notice to Builder and have the vessel completed by another shipyard. In such event, Builder grants Customer and its designee an irrevocable license to use all Specifications necessary to complete the performance of this contract.

3

## FIVE
### DELIVERY AND ACCEPTANCE AND RISK OF LOSS

The vessel shall be delivered safely afloat to the Customer at the Builder's dock at Bayou La Batre, AL. Upon completion of reasonable sea trials satisfactory to Customer, Customer shall visually inspect said vessel. If inspection indicates no apparent defect, and if the vessel has been completed in compliance with this contract, including the requirements in Paragraph Thirteen, Customer agrees to accept delivery within three (3) days of the completion of the sea trials and the completion of the construction of the vessel. Buyer shall not unreasonably withhold acceptance of the vessel. Customer agrees to sign a written acceptance to evidence Customer's acceptance of the vessel. All risk of loss shall pass to Customer upon delivery and acceptance.

If Customer does not accept the vessel, Customer shall notify Builder in writing, within three (3) days of the completion of the sea trials, of the exact nature of any defect(s) or fault(s) at that time that constitutes a refusal to accept such vessel. Customer shall give Builder a reasonable time within which to correct such defect(s) not to exceed 30 days after receipt of written notice of same. Upon satisfactory correction of such defect(s) or fault(s), and if no other defects or deficiencies are then existing, Customer shall immediately accept the vessel. In the event Customer and Builder are unable to agree that the reason for refusing to accept the vessel constitutes a fault or defect, the dispute shall be resolved in accordance with Paragraph Fifteen below.

If the vessel is destroyed prior to delivery and acceptance, this contract shall terminate, and Customer's sole remedy shall be the refund of all payments made hereunder and the refund of the cost of Customer's furnished equipment. Builder agrees to indemnify, defend and hold harmless the Customer, its officers, directors, employees and representatives, of and from any and all claims for damages arising from injuries to any person or property occurring in, about or connected with the building, launching or trials of the vessel during the period prior to the delivery of the vessel and acceptance thereof by Customer, howsoever caused, including strict liability (including defects that pre-exist the date of this contract), fault and negligence of Customer. Customer's subcontractors shall give proof of prior insurance to commencing work on the hull. If any subcontractor of Customer lacks insurance, Customer shall have the option of obtaining a new subcontractor or agreeing to indemnify Builder from claims from said subcontractor.

Upon delivery to Builder by Customer or Customer's representative of any Customer supplied documents, materials and equipment as called for by the Specifications, Builder shall take possession of such items and adequately and properly store and maintain those items. Any costs of repair to or replacement of such items necessitated by any damage to or loss of such items which occurs after delivery by the Customer of the items to Builder shall be borne entirely by Builder.

4

## SIX
## CHANGE ORDERS

Customer may at any time propose alterations and deletions, except as to increase in the vessel's dimensions, to the work to be performed without invalidating this contract. Any change requested shall be submitted in writing by Customer to the Builder specifying in complete detail the items of material and work to be accomplished, at which time the Builder will price out the change and present it to customer for approval and payment. Unless otherwise agreed by the Builder in writing, full payment is to be made by Customer before the change is made. Builder may substitute other sizes and types of material for that specified, providing the same is of equal quality, strength, and suitability for the use intended, with prior written Customer approval. If a change involves a delay in completion, Builder shall not be liable to Customer for liquidated damages for any delay or late delivery occasioned thereby. Approval of a deletion or addition, the change in cost therewith, and the time involved in delaying completion because of said change shall be authorized only by Customer and accepted by Customer and Builder in writing.

## SEVEN
## INSURANCE

Builder will assume all risks of loss as to all persons, materials, machinery, parts· and equipment of the vessel during the construction and until completion and delivery to the Customer and acceptance thereof. During the construction period and until delivery and acceptance, Builder shall maintain Builder's Risk Insurance on the vessel and all components and material.

Until the vessel has been completed, physically delivered and accepted by Customer, the vessel and materials, outfit, equipment and appliances to be installed in the vessel, including all materials, outfit, equipment and appliances provided by Customer and delivered to Builder's yard for and used or to be used on the construction thereof shall, at the expense of the Builder, be kept fully insured under standard Builder's Risk Insurance Policy. The amount of such insurance shall not be less than the aggregate of the amounts to be paid to Builder by Customer, plus the value of any materials, outfit, equipment and appliances furnished by Customer, whether installed or stored in Builder's yard. As its interest may appear, Customer shall be a loss payee on said policy to the extent of payments made by Customer to Builder hereunder plus the value of any such materials, outfit, equipment and appliances furnished by Customer.

Builder shall also purchase and maintain, at its expense, during the life of this contract, Workman's Compensation Insurance, with United States Longshoremen's and Harbor Workers endorsement, in customary amounts and Commercial General Liability Insurance, including contractual liability coverage for Builder's indemnity obligations in this contract, with limits of not less than One Million ($1,000,000.00) for each bodily injury or death per person and with limits of not less than Five Hundred Thousand Dollars ($500,000.00) for property damage. Customer shall be added as an additional insured in the Commercial Liability policy and all excess or umbrella policies. Builder

5



shall require all of its subcontractors to have the same workers' compensation and general liability insurance Builder is required to maintain hereunder.

## EIGHT
## DEFAULT

If any of the following events shall occur:

(a) The Customer shall fail to make any payment when due under this contract or fail to accept delivery of the vessel completed in accordance with this contract and such failure shall continue for more than thirty (30) days after the Builder shall have given notice thereof to the Customer; or

(b) The Customer or Builder shall file a voluntary petition in bankruptcy or shall be adjudicated bankrupt or insolvent, or shall file a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any federal, state or other law or regulation, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of itself or of all or any substantial part of its assets, or shall make any general assignment for the benefit of creditors, or shall liquidate or dissolve; or

(c) A petition shall be filed against the Customer or Builder seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal, state or other law or regulation, and such petition shall remain undismissed or unstayed for an aggregate of forty-five (45) days, or if any trustee, receiver or liquidator of the Customer or of all or any substantial part of its properties shall be appointed without the consent or acquiescence of the Customer and such appointment shall remain unvacated or unstayed for an aggregate of forty-five (45) days; or

(d) Builder shall fail to execute the contract work in accordance with specified work schedule or otherwise to comply with any of its obligations under this contract (except and to the extent that such failure is due to force majeure or excusable delays as provided in paragraphs Four and Six respectively) and such failure shall continue for more than thirty (30) days after the Customer shall have given written notice thereof to Builder;

Then in any such event, the party not in default may terminate this contract by written notice to the other. Upon termination, the terminating party shall retain all right to damages from any default resulting in termination and may exercise all rights and

6

remedies available to it at law, in equity, or otherwise, in connection with said default except as otherwise provided in this Agreement.

## NINE
### CONSTRUCTION OF CONTRACT

This contract shall be construed according to the laws of the State of Alabama.

## TEN
### SECURITY FOR PAYMENT

The Customer shall have, and the Builder hereby grants to Customer, a security interest in the uncompleted vessel during all stages of its construction from the inception until delivery and passage of title to the Customer. Said security interest shall cover the uncompleted vessel, and all parts, equipment, and material designated to be used in the construction of said vessel, including Customer-supplied equipment, and shall be construed in accordance with the provisions of Article 9 of Title 7A of the Code of Alabama (1975), which is known and cited as Uniform Commercial Code – Secured Transactions. This security interest shall secure to Customer the advance or advances which it is making to Builder as provided in the payment section of this contract, which money shall be used by Builder for the payment of expenses incurred in the building of the vessel, including, but not limited to, a pro rata portion of overhead expenses of the Builder. Builder warrants that all monies received from Customer pursuant to this contract will be so utilized in order to ensure that the security interest created hereby in favor of Customer shall be a purchase money security interest within the meaning of the Uniform Commercial Code – Secured Transactions.

Builder will execute all documents and cooperate fully in order that Customer may duly perfect the security right created hereunder.

Builder warrants that Builder will pay its suppliers and workmen on time for all materials, equipment and labor which go into the construction of the vessel and that its books and records reflecting that these debts are kept current will be made available for reasonable inspection by the Customer. Builder also warrants that, insofar as is reasonably practical, all equipment and materials purchased for use in the construction of the vessel will be marked, tagged or stored in such a manner that they may be readily identifiable as destined for use in the vessel.

Builder warrants that the security interest given to Customer by this contract will be superior to all other security interests in the secured property.

7



## ELEVEN
## ASSIGNMENT

This contract may not be assigned by Customer or Builder without the prior written consent of the other; provided, however, this contract may be assigned by Customer to an affiliate of Customer without Builder's consent so long as Customer at all times remains fully responsible for the full payment and performance of this contract.

## TWELVE
## COMMISSIONS

Should any third party claim any fee or commission as a result of any prior agreement with Customer or Builder, Customer and Builder agree that the party who entered the agreement with such third party shall indemnify, protect and hold the other harmless from and against any claim asserted by such third party.

## THIRTEEN
## DOCUMENTS

Upon delivery of said vessel and acceptance thereof by Customer, Builder shall execute and deliver all documents and certificates required in the Specifications. Builder hereby warrants to Customer that upon delivery of said vessel and acceptance thereof by Customer, said vessel will be free and clear of and from all debts, encumbrances, liens and claims of liens, charges, assessments, taxes and liens of whatsoever kind or nature, maritime or otherwise, except as may have been created by Customer. At delivery, the Builder, at Builder's expense, shall cause the vessel to be certified by the Coast Guard as set forth in the Specifications. Builder will, at its cost, cure any defect in the Specifications or construction which causes the vessel not to be certifiable.

## FOURTEEN
## WARRANTIES

Builder hereby assigns and shall assign all subcontractor and manufacturer's warranties for all parts and labor to Customer.

(a) Construction Warranty: Builder warrants that, if at any time within one hundred eighty (180) days after delivery of the vessel there shall appear or be discovered in such vessel any defect in any Builder (including subcontractors of Builder) furnished workmanship or material or the design of the vessel, whether latent or patent (hereinafter called a "Construction Deficiency"), such Construction Deficiency shall be repaired or replaced by Builder, at Builder's expense, to the requirements of this contract and the Specifications. Builder shall be responsible for the cost of correcting any such Construction Deficiency only to the extent that the same resulted from

8

defective workmanship or material and not from ordinary wear and tear, or the negligence of improper act of Customer or any other person other than the Builder or its subcontractors, or from or as a result of latent defects or deficiencies in the equipment or materials furnished by Customer. Any work required to be performed to correct a Construction Deficiency for which Builder is liable hereunder shall be carried out at Builder's shipyard if practical. Where, it would be impractical to return the vessel to Builder's yard for repairs or replacements under this warranty, Customer may contract to have such work performed by another recognized shipyard or ship repair facility in relative proximity to the location of the vessel, and Builder shall be responsible only for a sum representing no more than the cost of corrections at straight time commercial shipyard or ship repair yard rates charged by Builder or prevailing on the coast of the Gulf of Mexico. In the event Customer elects to have any work required to be performed to correct a Construction Deficiency, Builder shall be notified three (3) days prior to the commencement of the work. Such notifications shall include description of the claimed deficiency, location of the vessel, and the company selected to perform the work. The one hundred eighty (180) day Construction Warranty constitutes Builder's sole warranty with respect to the quality, design, manufacture and fitness of said vessel.

(b) Other Warranty Matters: It is expressly provided that Builder does not warrant machinery, equipment and fittings purchased by Builder for installation in the vessel, but hereby extends and assigns the manufacturer's and/or supplier's warranty or guarantee, if any, to Customer. Builder will execute all documents to effectuate the assignment(s) required and will cooperate fully in order for Customer to receive the benefit of the assignment(s). Builder will be responsible for proper installation of said equipment purchased by Builder and installed in the vessel.

Except as otherwise provided in this contract, Builder makes no other warranty of any kind whatsoever, express or implied; and all implied warranties of workmanship, merchantability, and fitness for a particular purpose which exceed the warranties provided herein are hereby disclaimed by Builder and excluded from this contract. Furthermore, Builder shall have no liability under any circumstances for negligence or manufacturer's strict liability in connection with the design, manufacture or sale of the vessel other than the express warranties given herein.

## FIFTEEN
## FORUM SELECTION

All disputes, controversies or differences which may arise between Builder and Customer out of or in relation to or in connection with this contract, or for the breach



thereof, or for injunctive relief shall be resolved in U.S. District Court for the Southern District of Alabama.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed, this 17th day of November, 2006.

Customer's Signature:                          Builder's Signature:

Michel B. Moreno                               Wannan W. Bosarge, Jr.
President                                      President
Moreno Energy, Inc.                            BOCONCO, Inc.

Witness Signatures:



**BOCONCO**
**INCORPORATED**

Wire Transfer Information:
AmSouth Bank
ABA #062000019
Account # 40694399

10



## ESTOPPEL AND CONSENT CERTIFICATE

THIS ESTOPPEL AND CONSENT CERTIFICATE (this "Certificate") is made this 23rd day of April, 2008, by BOCONCO, Inc., an Alabama corporation ("Builder").

WHEREAS, pursuant to two (2) Vessel Construction Contracts (Hulls 128 and 129), dated November 17, 2006 (the "Construction Contracts"), between Moreno Energy, Inc., a Louisiana corporation ("Moreno"), and Builder, Builder is constructing two (2) 265-foot class liftboats (the "Vessels") for Moreno;

WHEREAS, pursuant to an Assignment and Assumption Agreement dated as of the date hereof, between Moreno and Superior Energy Services, L.L.C., a Louisiana limited liability company ("Superior"), Moreno is selling and assigning to Superior a fifty percent (50%) undivided interest in the Construction Contracts; and

WHEREAS, Builder is willing to consent to the foregoing assignment and assumption, and make certain representations to Superior with respect to the status of the Construction Contracts as provided in this Certificate.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged:

Section 1.    **Consent to Assignment.**  Builder hereby consents to the assignment by Moreno, and the assumption by Superior, of a fifty percent (50%) undivided interest in each Construction Contract.

Section 2.    **Delivery of the Vessels.**  Builder hereby covenants and agrees that upon delivery and acceptance of each Vessel pursuant to the terms and conditions of the applicable Construction Contract, Builder shall convey title to such Vessel pursuant to a bill of sale evidencing each of Moreno's and Superior's undivided fifty percent (50%) ownership interest in such Vessel, unless otherwise directed in writing by each of Moreno and Superior.

Section 3.    **Estoppel.**  Builder hereby represents and warrants to Superior that as of the date hereof:

(a)    Each of the Construction Contracts has been duly authorized and executed by Builder, and constitute valid and binding obligations of Builder, enforceable in accordance with their respective terms.

(b)    Builder is not in default under any of the Construction Contracts and, to the best knowledge of Builder, Moreno is not in default thereunder, nor is Builder aware of any condition or circumstance that with the passage of time or the giving of notice, or both, could constitute a default under any of the Construction Contracts.

(c)    There are no existing defenses, claims, counterclaims or off-sets which Builder has against the enforcement of the Construction Contracts by Moreno.



EXHIBIT
"E"

(d)     The aggregate amount of progress payments made by Moreno pursuant to the Construction Contracts prior to the date hereof are as follows:   (i) Hull 128 – $15,727,918; and (ii) Hull 129 – $14,767,918.

(e)     The aggregate amount of progress payments required to be made pursuant to the Construction Contracts after the date hereof are as follows:   (i) Hull 128 – $3,820,000; and (ii) Hull 129 – $3,580,000.

IN WITNESS WHEREOF, Builder has executed this Certificate as of the day and year first written above.

BOCONCO, INC.

By: 

Name: WANNAN W. BOSARGE, JR.

Title: PRESIDENT



14530 SHELL BELT ROAD
BAYOU LA BATRE, AL 36509-2353
PHONE: (251) 824-7667
FAX: (251) 824-1667

# INVOICE

9 JUNE, 2009

MORENO ENERGY, INC.
600 JEFFERSON ST SUITE 1400
LAFAYETTE, LA 70501

SUPERIOR ENERGY SERVICES, LLC
4706 CURTIS LANE
NEW IBERIA, LA 70560

CONTRACT: HULL 128

THIS FINAL BILLING IS PRESENTED IN ACCORDANCE WITH THE PROFORMA
INVOICES DATED 18 FEBRUARY 2009 AND 10 MARCH 2009.

COST OF VESSEL AT COMPLETION ........................................ $ 22,263,674.32

PROFIT (10% OF ORIGINAL CONTRACT) ............................... $   1,910,000.00

TOTAL PRICE OF VESSEL............................................................. $ 24,173,674.32


AMOUNT RECEIVED TO DATE.................................................... $(22,497,008.81)

FINAL BILLING ........................................................................... $   1,676,665.51

TOTAL INVOICE ....... $  1,676,665.51

DUE: NET 2 DAYS





**14530 SHELL BELT ROAD**
**BAYOU LA BATRE, AL 36509-2353**
**PHONE: (251) 824-7667**
**FAX: (251) 824-1667**

# INVOICE

9 JUNE, 2009

MORENO ENERGY, INC.
600 JEFFERSON ST SUITE 1400
LAFAYETTE, LA 70501

SUPERIOR ENERGY SERVICES, LLC
4706 CURTIS LANE
NEW IBERIA, LA 70560

CONTRACT: HULL 129

THIS FINAL BILLING IS PRESENTED IN ACCORDANCE WITH THE PROFORMA
INVOICES DATED 18 FEBRUARY 2009 AND 10 MARCH 2009.

COST OF VESSEL AT COMPLETION ...................................... $ 21,515,483.37

PROFIT (10% OF ORIGINAL CONTRACT) .............................. $   1,790,000.00

TOTAL PRICE OF VESSEL............................................................ $ 23,305,483.37

AMOUNT RECEIVED TO DATE.................................................... $(21,357,008.81)

FINAL BILLING ...................................................................... $   1,948,474.56

TOTAL INVOICE ...... $   1,948,474.56

DUE: NET 2 DAYS



Kenneth A. Watson
Direct Dial 251-439-7555
Direct Fax 251-433-1106
kwatson@joneswalker.com

*Lawyers at Miller Hamilton Snider & Odom joined the law firm of Jones Walker effective September 1, 2008, and will continue to provide legal services under the name of Jones Walker.*

June 12, 2009

Via E-Mail (kjr@alaconsumerlaw.com) and First Class Mail
Kenneth J. Riemer, Esq.
166 Government St., Suite 100
Mobile, Alabama 36602

      Re:    <u>Superior v. Boconco</u> – Invoices Submitted by Boconco dated June 9 and June 10

Dear Ken:

      The invoices for Hulls 128 and 129, dated June 9, 2009, and invoices for Hulls 130 and 131, dated June 10, 2009, which Boconco recently forwarded to Superior have been provided to me for response. Superior rejects these invoices as the same are not consistent with the contracts for the construction of these vessels and are otherwise inaccurate.

      I look forward to continuing to work with you on this matter.

                         Cordially yours,

                         Kenneth A. Watson
                         For the Firm

KAW.bbk
cc:    Bill Masters, Esq.



EXHIBIT
"G"

JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE L.L.P.

254 STATE STREET  MOBILE, ALABAMA 36603-6474 · 251-432-1414 · FAX 251-433-4106  E-MAIL info@joneswalker.com · www.joneswalker.com
ALABAMA · DISTRICT OF COLUMBIA · FLORIDA · GEORGIA · LOUISIANA · TEXAS