# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| SUPERIOR ENERGY SERVICES, LLC, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION 09-00321-KD-C |
| ) | |
| BOCONCO, INC., ) | |
|     Defendant. ) | |

## ORDER

This matter is before the Court on Defendant Boconco, Inc. ("Boconco")'s Motion for Summary Judgment (Docs. 68, 69), Plaintiff Superior Energy Services, LLC ("Superior")'s Response (Docs. 71, 72), Boconco's Reply (Doc. 73) and Superior's Sur-Reply (Doc. 77).

**I.**     **Procedural Background**

In June 2009, Superior filed a complaint against Boconco concerning the construction of vessels designated as Hulls 128, 129, 130, and 131. (Docs. 1, 4). After all pending claims were resolved through a settlement agreement (Docs. 17, 24), the action was dismissed on August 27, 2009. (Doc. 17). With leave of court, this action was reinstated on September 28, 2009. (Doc. 19). Superior filed an amended complaint (Doc. 22) on October 30, 2009.

In the Second Amended Complaint, filed after arguments and disagreements arose over the terms of the settlement agreement, Superior added Thompson Tractor Co. ("Thompson") as a defendant and sought a declaratory judgment that Superior, not Boconco, is the rightful owner of four (4) generator sets ("gensets") which are in Thompson's possession. In Count Two, Superior asserts a conversion action against Boconco, seeking compensatory damages in the amount of $387,333, "plus punitive damages, together with interest, attorney's fees, and costs." (Id. at 7).

1

In Count Three, Superior asserts a breach of contract action against Boconco, again seeking $387,333, plus interest, attorney's fees, and costs. (Id.)

In the Second Amended Complaint, Superior alleges that the four gensets under dispute are part of six gensets originally installed on the uncompleted vessels Boconco had been in the process of constructing, described as Hulls 128 and 129. (Doc. 22). Although this construction was pursuant to a contract between Boconco and a non-party to this suit, Moreno Energy, Inc. ("Moreno"), Superior acquired the vessel-building contracts, and thus in Hulls 128 and 129. Upon inspecting the hulls, Superior decided that the 175kw gensets produced insufficient power. As a result, Superior contends that it purchased four 300kw gensets at their own cost, and had Boconco install these, two each, on Hulls 128 and 129. Two of the six 175kw generator sets, one on each hull, remained as spare generators. The remaining four 175kw gensets were removed by Bonconco from the hulls altogether.

> Superior explains the disposition of those four remaining gensets:
>
> Hulls 128 and 129 were subsequently delivered to Superior with the four 300 kw gensets purchased directly by Superior on board, and two of the 175 kw gensets on board as spares. The other four 175 kw gensets were returned to the supplier thereof, Thompson. Superior was not given a credit on the purchase price of Hulls 128 and 129 for the four 175 kw gensets not used in the construction and was not given an offset for the cost Superior incurred in providing the four 300 kw gensets installed on Hulls 128 and 129. Rather, it was agreed that the four 175 kw gensets returned to Thompson were to be held as property of Superior, and that two of those 175 kw gensets would be installed as spares on Hulls 130 and 131 (which at the time were being constructed by Boconco for Superior) and that Superior would use the remaining two 175 kw gensets as spares elsewhere in its operations.

(Doc. 22 at 3-4).

Boconco's progress in completing Hulls 130 and 131 was halted when Superior terminated those contracts, bringing an action for possession of those hulls and for damages

against Boconco. (Id. at 4). That action resulted in a settlement agreement, filed under seal. (Doc. 24) The disposition of the gensets, now at issue, was not specifically addressed in the settlement agreement.

## II.  Facts[1]

Superior's business it to provide oil and gas services and equipment. Superior's Director of Operations is Dwayne Boudreaux "(Boudreaux)."

Boconco operates a shipbuilding business in Bayou La Batre, Alabama, designing and constructing oil production industry support vessels. The President of Boconco is Wannan "Rusty" Bosarge, Jr. ("R.Bosarge"). Kenny Bosarge ("K.Bosarge") is also employed at Boconco. According to Boudreaux, both Kenny Bosarge and his brother, Rusty Bosarge, held themselves out as authorized to speak for Boconco.[2]

On November 17, 2006, Boconco and Moreno entered into two construction contracts under which Boconco was to construct two 265 feet (leg length) lift boats (Hull 128 and Hull 129), with each vessel having three 175kw Caterpillar generators ("C9s" or "gensets") -- two main and one emergency genset per hull– for a total of six 175kw gensets. On January 31, 2007, Boconco issued a Purchase Order to Thompson for, in part, six 175kw gensets for Hulls 128 and 129.

In March 2008, Boconco entered into two additional lift boat contracts with Superior for Hull 130 and 131. On April 23, 2008, Superior and Moreno entered into an Assignment and

---

[1] When ruling on a motion for summary judgment, the Court views "the evidence and all reasonable inferences in the light most favorable to the non moving party." Battle v. Board of Regents for Ga., 468 F.3d 755, 759 (11th Cir. 2006).

[2] Boconco has submitted no evidence on summary judgment to contradict this assertion by Superior.

Assumption Agreement under which Superior initially acquired a 50% interest in the contract for the construction of Hull 128 and Hull 129. Ultimately, Superior acquired all of Moreno's rights as to Hulls 128, 129, 130 and 131.

In June 2008, after inspecting the construction on Hulls 128 and 129, Superior notified Boconco that it wanted to replace four of the six 175kw gensets, which had already been installed in said hulls, with four larger 350kw gensets. In mid-June 2008, Superior's Director of Operations, Dwayne Boudreaux "(Boudreaux"), informed Kenny Bosarge (of Boconco) of this requirement and initially Boconco, through Kenny, objected stating that the 175kw gensets had been specified and agreed to in the contract and so Boconco should have no burden for the upgrade. Boudreaux told Kenny that he understood his position and would report same to his superiors. Subsequently, Boudreaux and Kenny discussed whether Superior would receive an offset against the purchase price of Hulls 128 and 129. No agreement was made at that time.

In early August 2008, the 300kw gensets arrived at the shipyard. Boconco then removed the four 175kw gensets from Hull 128 and Hull 129. After the gensets were removed from the hulls, they were placed outside the Boconco office building. At that time, Boudreaux had an additional discussion with Kenny Bosarge on Boconco's shipyard, in which they "agreed (1) that Superior would pay for the 300 kw generators which would replace the 175s being removed from Hulls 128 and 129; (2) that Superior would pay Boconco for the work in removing the 175s and other work necessary to retrofit the 300 kw gensets to the hulls; (3) that there would be no offset against the purchase price of Hulls 128 and 129 for the 175s even through [sic] they would not be used in the construction of those hulls; and (4) accordingly, the four 175s removed from Hulls 128 and 129 would be the property of Superior." ((Doc. 72 at 5 (Aff. Boudreaux at ¶6)).

According to Boudreaux, his statement to Kenny Bosarge "was something to the effect of '[t]here is no problem, Kenny, we [Superior] will pay for the 300s, pay you to remove the 175s and install the 300s, and take no offset for the 175s, but those will be our gensets." (Id.) "With this assurance Mr. [Kenny] Bosarge, on behalf of Boconco, agreed that upon removal of the 175s from Hulls 128 and 129 the same were the property of Superior." (Id.)[3]

Also at that time, Boudreaux and Chuck Castro (of Thompson) discussed what other uses or disposition Superior might make of the 175kw gensets; it was discussed that Superior would later provide two of the four 175kw gensets to be used as emergency generators on Hulls 130 and 131 and that the remaining two might potentially be sold to another party for Superior's credit or be converted to stand-alone portable generator units which Superior could use elsewhere in its operations. (Doc. 72 at 5-6 (Aff. Boudreaux at ¶7)). Kenny Bosarge participated in the Boudreaux-Castro discussions concerning the disposition of the four 175kw gensets; he never expressed any opposition to Superior's control over the disposition of the gensets.

Castro made notes contemporaneous with the discussion: Castro's notes indicate that Boconco was to return two of the 175kw C9 gensets "for warehousing and sell to interested party[;]" and return two of the 175kw C9 gensets "for keeping until Hull 130 & 131 are

---

[3] However, according to Rusty Bosarge "[w]e were simply told that the existing installed main generators would be replaced with 350kws Cummins generators and that the C9 emergency generators would remain as originally specified. This meant that there were 4 unused C9 units." (Doc. 69-1 at 3 (Aff. R.Bosarge at ¶9)). Rusty Bosarge asserts "[w]e never contemplated nor agreed to transfer ownership to the four unused C9s to Superior and Boconco never entered into any agreement, written or otherwise, which would require us to transfer those four C9s back to Superior." (Id. (Aff. R.Bosarge at ¶10)). According to Rusty Bosarge, on or about June 20, 2008, Boconco paid for all six 175kw gensets "out of our general fund" and payment was "received by Thompson[]" and "[t]hese units were later delivered to Boconco." (Doc. 69-1 at 2 (Aff. R.Bosarge at ¶7)).

5

required." (Doc. 72 at 10).  Sometime in the Fall of 2008, Boconco asked Thompson to pick up the four 175kw gensets and take them to Thompson for safe keeping during a tropical storm.

On December 29, 2008, change orders (two orders #17 and two orders #18, for Hulls 128 and 129) were executed "consistent with the [oral] agreement that was reached in August." (Doc. 72 at 6 (Aff. Boudreaux at ¶9) and Ex. B thereto (Doc. 72 at 11-14)).  These change orders provided for an increase in the purchase price of the hulls in the amount of $110,000 to upgrade the main panels to support the 300kw generators (instead of the 175kw gensets) and adding $31,680 to the price of the hulls for work including changing out the 175kw gensets for the 300kw gensets, noting that "customer supplied the 300kw generators."  (Id. at 7 (Aff. Boudreaux at ¶9) and Doc. 72 at 13-14)).  Each change order was signed by Boudreaux for Superior, Rusty Bosarge for Boconco, and Michael Debaillon for Moreno.  None of the change orders provided Superior with an offset against the purchase price of Hulls 128 and 129.

In March 2009, Boconco delivered Hull 128 and Hull 129 to Superior even though there was a dispute regarding what was owed.  According to Boconoco, "[w]e were told by Superior that the outstanding amounts owed on Hulls 128 and 129 would be paid over the course of the construction of the other two hulls[]" and "[b]ased on these assurances, we agreed to deliver Hulls 128 and 129, even though amounts were outstanding as to those hulls."  (Doc. 69-1 at 4 (Aff. R.Bosarge at ¶15-16)).  Included in the disputed amounts were charges for change orders.

On June 5, 2009, Superior filed this litigation.

On June 9, 2009 and June 10, 2009, Boconco prepared and submitted invoices to Superior for work on Hulls 128 and 129.  These invoices are dated and were issued by Boconco after Superior terminated its contracts for Hulls 130 and 131 and after Superior had sued

6

Boconco in this case. In response, Superior rejected Boconco's invoices as inconsistent with the contracts and otherwise inaccurate.

Boudreaux was directly and significantly involved in the consummation of the settlement agreement. According to Boudreaux, the ownership of the four 175kw gensets were not made a subject of the settlement agreement because the parties had already agreed that the gensets were Superior's property and Superior had possession through Thompson. During the negotiation process, Boudreaux located the four 175kw gensets' cooling towers in the Boconco shipyard and told Kenny Bosarge that "those were the cooling towers for Superior's 175s stored at Thompson. Mr. Bosarge agreed and thus the cooling towers were included [in] Schedule 1 of the settlement agreement." (Doc. 72 at 8-9 (Aff. Boudreaux at 12)).

On August 12, 2009, Superior and Boconco executed a Settlement Agreement. (Doc. 24 (sealed)). In relevant part, the Settlement Agreement provides:

> D. There exist several disputed matters as between the Parties under the Contracts in connection with the construction of the Vessels and the Parties desire to fully and finally settle all such disputes, together with all other claims arising under, related to or in connection with the Contracts and the transactions contemplated thereunder.
> * * *
> 1. (b) Ship-owner shall take title to and possession of the Partially Completed Vessels and all of the Equipment (as defined in Section 1(d) below).
> * * *
> 5. (b) Each party agrees that each of its respective rights, remedies and obligations under the Contract are hereby terminated. Builder further agrees that those invoices prepared by Builder and delivered to Ship-owner dated June 9, 2009 with respect to the Delivered Vessels [Hulls 128 and 129] and dated June 10, 2009 with respect to the Partially Completed Vessels [Hulls 130 and 131] are rescinded, and Ship-owner shall have no obligation or liability with respect to such invoices or any other invoices issued by Builder.
> * * *
> 17. This Agreement, its exhibits, schedules and appendices, represent the entire agreement among the Parties with respect to the subject matter hereof and thereof, and supersedes any and all previous correspondence, discussions, negotiations,

7

arrangements or agreements, whether oral or written, by the Parties or any other person.

In September 2009, Boconco contacted Thompson to arrange for pick up the four 175kw gensets which were being stored at Thompson; Thompson declined, stating that Superior had requested them.

**III.     Analysis**

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[4] Boconco, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993)

---

[4] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted: "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

(internal citations and quotations omitted).

Boconco contends that they are entitled to summary judgment because the settlement agreement specifically terminated "each party's respective rights, remedies, and obligations under each of the four vessel contracts" (from which the generator contracts stem). Essentially, Boconco argues that Superior could have bargained for the title to the four gensets in the months leading up to the settlement agreement, but since they failed to do so, they "cannot now attempt to enforce any alleged pre-existing agreement" because all claims relating to the vessel contracts were disposed of by virtue of the settlement agreement. Boconco contends that the settlement agreement terminated all rights and obligations stemming from the four vessel contracts, and that clearly Superior's gensets claim arises from those contracts, as the generators were intended for use on Hulls 130 and 131. Furthermore, Boconco argues that if Superior did have an agreement with them as to the ownership of the gensets, the rights stemming from that agreement were subsumed and destroyed by the Settlement Agreement.

In the absence of fraud (which is not alleged here), "a valid written contract merges all prior and contemporaneous negotiations on the subject. Distinct agreements, are not, however, merged. Neither are rights already vested under oral agreements affected." 17A C.J.S. CONTRACTS § 417.

> As detailed in Hinds v. Plantation Pipe Line Co., 455 F.2d 902, 906-907 (5th Cir. 1972):
>
> Alabama acknowledges a further exception to the parol evidence or merger rule where the oral agreement is separate or distinct from that contained in the written agreement. In Hartford Fire Insurance Company v. Shapiro, 270 Ala. 149, 117 So.2d 348, 353 (1960), the Alabama Supreme Court recognized this exception contingent upon the existence of the three following conditions: the agreement must in form be a collateral one; it must not contradict express or implied provisions of the written contract; and it must be one that parties ordinarily would not be expected to embody in the written instrument.

See also e.g., Alabama Elec. Co-op., Inc. v. Bailey's Constr. Co., Inc., 950 So.2d 280, 289 (Ala. 2006) (An oral agreement to insure was not collateral to an insurance policy, "[i]n light of the fact that the written contract dealt expressly with the subject matter of the alleged collateral oral agreement[]"). The court finds as a matter of law that the alleged prior oral agreement specifically relates to settlement agreement and is not collateral. The settlement agreement specifically references all four contracts, acknowledges disputes as to the contracts (without delineating the disputes) and then indicates that "the Parties desire to fully and finally settle all such disputes." There is no merit in Superior's contention that the dispute regarding the gensets is collateral to the subject matter of the settlement agreement. The evidence clearly establishes that the gensets were part of the four contracts at issue in the settlement agreement.

However, if a prior oral contract existed, which provided for Superior's ownership of the four gensets, *and* that oral contract was fully executed before the settlement agreement, then the settlement agreement does not foreclose Superior's claims. Conversely, if an oral contract providing for Superior's ownership of the four gensets did not exist or if such contract did exist but was executory at the time of the settlement agreement, Superior's claims are foreclosed. See, e.g., E.T. Gray & Sons v. Satuloff Bros., 105 So. 666, 668 (Ala. 1925) (noting that where a contract is executory, the parties may abandon, rescind or modify by subsequent agreements); Peoples Bank & Trust v. Coleman, 736 F.2d 643, 645 (11th Cir. 1984) (stating that in Alabama, parties to a contract may modify an executory contract "as they see fit").

The court assumes for purposes of summary judgment that an oral agreement existed concerning the gensets. According to Superior, the oral agreement provided: (1) that Superior would pay for the 300 kw generators which would replace the 175s being removed from Hulls

10

128 and 129; (2) that Superior would pay Boconco for the work in removing the 175s and other work necessary to retrofit the 300 kw gensets to the hulls; (3) that there would be no offset against the purchase price of Hulls 128 and 129 for the 175s even though they would not be used in the construction of those hulls; and (4) accordingly, the four 175s removed from Hulls 128 and 129 would be the property of Superior. ((Doc. 72 at 5 (Aff. Boudreaux at ¶6)).

Superior has claimed that Boconco breached this oral agreement by failing to relinquish title to the gensets, *i.e.*, Boconco has not performed. However, for the agreement to be executory, performance must remain due to some extent on both sides. There does not appear to be a dispute that an offset was not claimed by Superior and that the 300kw generators were purchased by Superior. However, the payment for the removal and retrofit, which was part of the alleged oral agreement, clearly became a disputed issue in the lawsuit.

As of at least June 9, 2009, immediately after the lawsuit was filed, Bonconco claimed that money was still due on the contracts regarding Hull 128 and Hull 129. Superior immediately disputed the invoice through their attorney. Bonconco claims, and Superior has not disputed, that the amounts in dispute concerned, in part, the outstanding change orders on Hull 128 and 129. Therefore, assuming there was an oral agreement regarding the gensets, a dispute was ongoing whether Superior had completely performed its obligation to pay for the removal of the gensets and the retrofit. Subsequently, as part of the settlement agreement executed on August 12, 2009, Bonconco specifically agreed to rescind the June 9, 2009 invoice. In other words, the settlement agreement specifically resolved the dispute concerning the amount owed

11

for the change orders on Hulls 128 and 129.[5]  Thus, at least one term of the alleged prior oral agreement, the provision to pay for the removal and retrofit, was in dispute and was resolved by the settlement agreement.  Therefore, considering the breadth of the merger clause in the settlement agreement, any prior oral agreements that were in dispute merged into the settlement agreement.

**IV.    Conclusion**

Accordingly, for the reasons set forth herein, it is **ORDERED** that Boconco's Motion for Summary Judgment is **GRANTED.**

**DONE** and **ORDERED** this the **12th** day of **November 2010.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE**

---

[5] If Bonconco attempted to assert a claim for monies owed for removing and replacing the 175kw gensets, such claim would be certainly be foreclosed by the settlement agreement.